# UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF WISCONSIN

| | |
|---|---|
| RUDY PATZKOWSKY, individually and on behalf of all others similarly situated,<br><br>　　　　Plaintiff,<br><br>　　v.<br><br>NUTRIEN AG SOLUTIONS, INC.; THE MOSAIC COMPANY; MOSAIC FERTILIZER, LLC; CF INDUSTRIES HOLDINGS, INC.; CF INDUSTRIES NITROGEN, LLC; CF INDUSTRIES INC.; KOCH AG & ENERGY SOLUTIONS, LLC; KOCH FERTILIZER LLC; KOCH FERTILIZER WEVER, LLC; KOCH FERTILIZER BEATRICE, LLC; KOCH FERTILIZER DODGE CITY, LLC; YARA NORTH AMERICA, INC.; and DOES 1–20.<br><br>　　　　Defendants. | Case No.<br><br>**CLASS ACTION COMPLAINT**<br><br>**DEMAND FOR JURY TRIAL** |

**TABLE OF CONTENTS**

I.   INTRODUCTION ................................................................................................. 1

II.  PARTIES ............................................................................................................ 3

III. JURISDICTION AND VENUE ........................................................................ 7

IV.  FACTUAL ALLEGATIONS ............................................................................ 8

   A.  OVERVIEW OF THE UNITED STATES FERTILIZER MARKET: THE THREE PRIMARY TYPES,
   THEIR APPLICATIONS, AND AGRONOMIC ROLE ........................................................ 8
      1. Nitrogen Fertilizers ............................................................................. 8
      2. Phosphate Fertilizers .......................................................................... 9
      3. Potash Fertilizers .............................................................................. 10
      4. Fertilizer Used by Farmers ............................................................... 11
   B.  UNITED STATES MARKET SIZE AND STRUCTURAL TRENDS OVER TIME ........................... 13
   C.  VERTICAL INTEGRATION AND DISTRIBUTION CHANNEL CONTROL ................................... 19
   D.  DEFENDANTS' CONSPIRACY DROVE FERTILIZER PRICES TO SUPRACOMPETITIVE LEVELS
   THAT CANNOT BE EXPLAINED BY SUPPLY AND DEMAND OR OTHER LEGITIMATE MARKET
   FORCES ................................................................................................................ 23
      1. Defendants' Parallel Pricing Caused Fertilizer Costs to Skyrocket ............... 23
      2. Defendants Coordinated Supply Curtailments and Capacity Reductions ......... 52
   E.  GOVERNMENT INVESTIGATIONS ........................................................................... 57
   F.  PLUS FACTORS SUPPORTING THE INFERENCE OF UNLAWFUL CONSPIRACY ..................... 60
      1. Extreme Market Concentration .......................................................... 61
      2. Conduct Against Individual Self-Interest ............................................ 62
      3. Opportunities for Collusion Through Joint Ventures, Trade Associations, Industry
      Meetings ............................................................................................... 64
      4. High Barriers to Entry ...................................................................... 74
      5. Inelastic Demand .............................................................................. 77
      6. High Degree of Product Interchangeability ........................................ 78
      7. Defendants' Prior Antitrust Violations and History of Cartel Conduct ........... 79

V.   ANTITRUST INJURY AND STANDING ..................................................... 80

VI.  TOLLING OF THE STATUTE OF LIMITATIONS ..................................... 80

VII. CLASS ACTION ALLEGATIONS ................................................................ 81

VIII. CAUSE OF ACTION ..................................................................................... 84

IX.  PRAYER FOR RELIEF ................................................................................. 85

X.   DEMAND FOR JURY TRIAL ...................................................................... 86

XI.  DESIGNATION OF PLACE OF TRIAL ........ERROR! BOOKMARK NOT DEFINED.

Plaintiff, on behalf of himself and all other persons and entities similarly situated (the "Class"), by and through his undersigned counsel, bring this Class Action Complaint against Defendants Nutrien Ag Solutions, Inc., The Mosaic Company, Mosaic Fertilizer, LLC, CF Industries Holdings, Inc., CF Industries Nitrogen, LLC, CF Industries, Inc., Koch Ag & Energy Solutions, LLC, Koch Fertilizer LLC, Koch Fertilizer Wever, LLC, Koch Fertilizer Beatrice, LLC, Koch Fertilizer Dodge City, LLC, Yara North America, Inc., and Does 1–20 (collectively, the "Defendants"). Plaintiff alleges the following upon personal knowledge as to his own actions and upon information and belief as to all other matters, based upon the investigation of his counsel.

## I.    INTRODUCTION

1.    Every year, American farmers make planting decisions that should be determined by soil science and agronomic need.  For more than five years, those decisions have been governed by something else: the pricing power of a small group of fertilizer producers who coordinated to ensure that no matter where a farmer looks for nitrogen, phosphate, or potash (potassium), the price is artificially elevated, the supply is constrained, and the answer to "why is it so expensive?" is always the same non-answer. This case is about those fertilizer companies' coordination. It is brought on behalf of American growers and other agricultural businesses who paid billions of dollars in supracompetitive fertilizer prices between 2021 and 2025 because five of the world's largest fertilizer companies—Nutrien, Mosaic, CF Industries, Koch, and Yara—conspired to fix prices and limit supply instead of competing fairly.

2.    Fertilizer is not a discretionary input—it is the foundation of American agricultural productivity, and there is no commercially viable substitute. United States farmers plant approximately 90 million acres of corn and 85 million acres of soybeans annually, and each of those acres requires nitrogen, phosphorus, and potassium applied at agronomically determined

rates. Without adequate fertilization, yields collapse by 20 to 40 percent or more. Farmers who face a price spike cannot simply shop elsewhere or skip the application.  The market is too concentrated and the penalty on production yields is too severe. Defendants knew this. Defendants' own executives tracked corn and soybean prices as the primary variable in their pricing decisions, explicitly calibrating fertilizer prices to what farmers could afford to pay rather than to what it cost to produce. That is not competition. It is exploitation.

3.      The Defendants in this case collectively control the American fertilizer supply chain from mine to farm gate. For example, Nutrien and Mosaic together account for more than 90% of North American phosphate and potash production capacity, and CF Industries, Koch, Nutrien, and Yara control 82% of domestic production of nitrogen.

4.      Beginning in or around 2021 and continuing through the present, Defendants engaged in a conspiracy to fix, raise, and maintain fertilizer prices at supracompetitive levels and to restrict supply in order to sustain those prices. The result was predictable and documented: fertilizer prices tripled, quadrupled, and in some products quintupled from their 2020 baseline, generating record profits for each Defendant while imposing catastrophic input cost increases on American farmers.

5.      The financial record is damning. Between 2020 and 2022, Nutrien's profits increased approximately 1,575%. Mosaic's net earnings rose approximately 438%. CF Industries' profits increased more than 900%. No competitive explanation accounts for profits growing 10 to 15 times faster than costs. Instead, they are cartel profits, arising from Defendants' coordinated exercise of market power.

6.      The federal government has reached the same conclusion. The DOJ Antitrust Division has opened a formal investigation targeting each Defendant named in this Complaint.

2

USDA Deputy Secretary Stephen Vaden publicly stated in January 2026 that Nutrien and Mosaic have been "colluding" to constrain supply and drive up prices — the public characterization of a senior official with access to the full investigative resources of the United States government.

7.      This lawsuit is brought under Section 1 of the Sherman Antitrust Act, 15 U.S.C. § 1, on behalf of a class of American farmers and agricultural purchasers who directly purchased Fertilizer Products[1] manufactured by Defendants at artificially inflated prices from January 1, 2021 through the present (the "Class Period"). This case seeks to hold Defendants accountable for the billions of dollars they unlawfully extracted from American agriculture, and to restore for the farmers the benefits of the competitive market conditions to which they are entitled under federal law.

## II.     PARTIES

### A. Plaintiff

8.      Plaintiff Rudy Patzkowsky operates a farm at 3149 State Highway 8, Okeene, Oklahoma and produces wheat. Since January 2021, Rudy Patzkowsky has purchased fertilizer products from Defendant Nutrien Ag Solutions at prices that were artificially inflated as a result of Defendants' price fixing conspiracy during the Class Period. Specifically, Rudy Patzkowsky purchased various forms of nitrogen, potash, phosphate, and NPK blended fertilizers from the Nutrien Ag Solutions retail location at 110 W Ash Street, Fairview, Oklahoma.

### B. Defendants

---

[1] "Fertilizer Products" means any single-nutrient fertilizer or multi-nutrient fertilizer blend containing nitrogen, phosphorus, potassium, or any combination thereof, including but not limited to: (a) nitrogen fertilizers such as anhydrous ammonia, urea, urea ammonium nitrate (UAN) solutions, ammonium nitrate, and ammonium sulfate; (b) phosphate fertilizers such as diammonium phosphate (DAP), monoammonium phosphate (MAP), triple superphosphate (TSP), and phosphoric acid-based products; (c) potash fertilizers such as muriate of potash (MOP, also known as potassium chloride), sulfate of potash (SOP), and potassium magnesium sulfate; and (d) multi-nutrient blends, compound fertilizers, and custom-blended NPK products containing any combination of the foregoing nutrients in any ratio.

9.      Defendant Nutrien Ag Solutions, Inc. ("Nutrien") is a wholly-owned subsidiary of Nutrien Ltd. and is organized and existing under the laws of Delaware, with its principal place of business in Loveland, Colorado.  Nutrien Ag Solutions, Inc. is a subsidiary and the retail arm of Nutrien Ltd. and is the largest agricultural retailer in the United States, capturing approximately 21% of all United States agricultural retail sales, with a significant majority of its fertilizer sales generated from Nutrien Ltd.'s own production.

10.     Defendant The Mosaic Company is a corporation organized and existing under the laws of Delaware, with its principal place of business in Tampa, Florida. Mosaic was formed in 2004 through the merger of IMC Global Inc. and the fertilizer businesses of Cargill, Incorporated. The Mosaic Company mines potash and phosphate in the United States.  Mosaic is a world-leading producer and marketer of concentrated phosphate and potash crop nutrients and sells and distributes fertilizer products in the United States.

11.     Defendant Mosaic Fertilizer, LLC is a wholly-owned subsidiary of The Mosaic Company that is organized and existing under the laws of Delaware, with its principal place of business in Tampa, Florida. Mosaic Fertilizer, LLC operates major fertilizer production facilities in Florida and Louisiana.  Unless otherwise specified, references to "Mosaic" herein encompass The Mosaic Company and Mosaic Fertilizer, LLC.

12.     Defendant CF Industries Holdings, Inc. is a corporation organized and existing under the laws of Delaware, with its principal place of business in Northbrook, Illinois. CF Industries Holdings, Inc., is one of the world's largest producers of nitrogen, with an extensive production and manufacturing network primarily located in North America. CF Industries Holdings, Inc. holds a 50% ownership in Point Lisas Nitrogen Limited, with Koch Industries Inc. holding the other 50%. CF Industries Holdings, Inc. is the ultimate parent entity of CF Industries

Nitrogen, LLC, CF Industries, Inc., and other foreign subsidiaries that are responsible for the production and distribution of fertilizer products outside of the United States.

13.     Defendant CF Industries Nitrogen, LLC is a wholly-owned subsidiary of CF Industries Holdings, Inc. that is incorporated in Delaware, with its principal place of business in Northbrook, Illinois. CF Industries Nitrogen, LLC is a leading producer of nitrogen fertilizers in the United States. CF Industries Nitrogen, LLC operates major nitrogen complexes in Donaldsonville, Louisiana; Sergeant Bluff, Iowa; Claremore, Oklahoma; Yazoo City, Mississippi; Woodward, Oklahoma; Waggaman, Louisiana and other domestic locations.

14.     CF Industries Inc. is a wholly-owned subsidiary of CF Industries Holdings, Inc. that is incorporated in Delaware with its principal place of business in Northbrook, Illinois. CF Industries Inc. is the primary operating subsidiary of CF Industries Holdings, Inc. for the sale and distribution of fertilizer in the United States.  Unless otherwise specified, references to "CF Industries" herein encompass CF Industries Holdings, Inc., CF Industries Nitrogen LLC, and CF Industries Inc.

15.     Defendant Koch Ag & Energy Solutions, LLC is a limited liability company organized under the laws of Delaware, with its principal place of business in Wichita, Kansas. Koch Ag & Energy Solutions, LLC is a wholly-owned subsidiary of Koch Inc and is the parent company of all Koch businesses that deal with the production, sale, and distribution of nitrogen fertilizer products.

16.     Defendant Koch Fertilizer, LLC is a wholly owned subsidiary of Koch Ag & Energy Solutions, LLC and a limited liability company organized and existing under the laws of Delaware, with its principal place of business in Wichita, Kansas. Koch Fertilizer LLC operates Koch's nitrogen fertilizer production, distribution, and trading businesses worldwide. Koch

Fertilizer LLC sells fertilizer products to agricultural purchasers in the United States. Koch Fertilizer LLC holds 50% ownership in Point Lisas Nitrogen Limited, with CF Industries Holdings, Inc. holding the other 50%.

17.     Defendant Koch Fertilizer Wever, LLC is a wholly owned subsidiary of Koch Ag & Energy Solutions, LLC and a limited liability company organized and existing under the laws of Delaware, with its principal place of business in Wichita, Kansas. Koch Fertilizer Wever, LLC produces nitrogen fertilizer at the Koch Fertilizer Wever, Iowa facility.

18.     Defendant Koch Fertilizer Dodge City, LLC is a wholly owned subsidiary of Koch Ag & Energy Solutions, LLC and a limited liability company organized and existing under the laws of Delaware, with its principal place of business in Wichita, Kansas. Koch Fertilizer Dodge City, LLC produces nitrogen fertilizer at the Koch Fertilizer Dodge City, Kansas facility.

19.     Defendant Koch Fertilizer Beatrice, LLC is a wholly owned subsidiary of Koch Ag & Energy Solutions, LLC and a limited liability company organized and existing under the laws of Delaware, with its principal place of business in Wichita, Kansas. Koch Fertilizer Beatrice, LLC produces nitrogen fertilizer at the Koch Fertilizer Beatrice, Nebraska facility. Unless otherwise specified, references to "Koch" herein encompass Koch Ag & Energy Solutions, LLC, Koch Fertilizer, LLC, Koch Fertilizer Wever, LLC, Koch Fertilizer Dodge City, LLC, and Koch Fertilizer Beatrice, LLC.

20.     Defendant Yara North America, Inc. ("Yara") is a corporation organized and existing under the laws of Delaware, with its principal place of business in Tampa, Florida. Yara North America is a subsidiary of Yara International ASA. Its activities range from phosphate mining and ammonia/urea production, to commodity trade and highly specialized agriculture and industrial products. Yara North America produces both nitrogenous and phosphatic fertilizers for

the agricultural and horticultural industry from Yara's network terminals across the United States and Canada.

### C. Agents and Co-Conspirators

21. The anticompetitive and unlawful acts alleged against the Defendants in this Complaint were authorized, ordered, or performed by Defendants' respective officers, agents, employees, or representatives while actively engaged in the management, direction, or control of Defendants' businesses or affairs.

22. Each corporate Defendant's agents operated under the authority and apparent authority of their respective principals.

23. Each corporate Defendant, through its respective subsidiaries, affiliates, and agents, operated as a single unified economic entity.

24. Various persons and/or firms not named as Defendants herein may have participated as co-conspirators in the violations alleged herein and may have performed acts and made statements in furtherance thereof. Plaintiff will amend this Complaint to allege the identities of these co-conspirators when they are ascertained.

25. Each Defendant acted as the principal or agent of, or for, other Defendants with respect to the acts, violations, and common course of conduct alleged herein.

26. When Plaintiff refers to a corporate family or companies by a single name in their allegations of participation in the conspiracy, it is to be understood that Plaintiff is alleging that one or more employees or agents of entities within the corporate family engaged in conspiratorial acts or meetings on behalf of all the Defendant companies within that family.

### III. JURISDICTION AND VENUE

27. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§

1331 and 1337, and Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26. The claims asserted herein arise under Section 1 of the Sherman Act, 15 U.S.C. § 1.

28.     Venue is proper in this District pursuant to 15 U.S.C. § 22 and 28 U.S.C. § 1391(b) and (c) because one or more Defendants transacted business in this District.

29.     This Court has personal jurisdiction over Defendants because they have purposefully availed themselves of the privilege of conducting business in the United States, and have engaged in the conspiracy alleged herein that was directed at and caused harm throughout the United States, including in this District.

## IV.     FACTUAL ALLEGATIONS

### A.     Overview of the United States Fertilizer Market: The Three Primary Types, Their Applications, and Agronomic Role

30.     Fertilizer is not a discretionary input — it is the foundation of American agricultural productivity. Without added fertilizer, soil loses fertility, yields decline, and crop quality deteriorates. Modern commercial agriculture depends on three primary plant macronutrients—nitrogen (N), phosphorus (P), and potassium (K)—that must be replenished through fertilizer applications because harvesting crops permanently removes these nutrients from the soil. The following summarizes the key types within each category and their agronomic uses.

#### 1. Nitrogen Fertilizers

31.     Nitrogen is the most widely consumed fertilizer nutrient by volume, accounting for approximately 59% of total United States fertilizer consumption, roughly twice the combined consumption of phosphate and potash. Nitrogen is essential for vegetative growth, protein synthesis, and chlorophyll production, making it the primary driver of crop yield. Because soil microbes continuously consume and volatilize nitrogen, it must be replenished with every growing season, creating consistent and inelastic annual demand.

8

32. The principal nitrogen fertilizer products include: (a) Anhydrous Ammonia ($NH_3$), the most concentrated nitrogen fertilizer at 82% nitrogen by weight, applied as a pressurized gas directly into the soil and used primarily for corn and wheat production in the Midwest; (b) Urea ($CO(NH_2)_2$), containing approximately 46% nitrogen and the most widely traded solid nitrogen fertilizer globally—used across virtually all major crop types including corn, wheat, rice, sugarcane, cotton, and vegetables; (c) Urea Ammonium Nitrate (UAN), a liquid fertilizer solution containing 28–32% nitrogen used in fertigation and surface application for corn and wheat; (d) Ammonium Nitrate (AN), a dry granular product with approximately 34% nitrogen used in grain production; and (e) Ammonium Sulfate (AS), a by-product of industrial processes containing 21% nitrogen and 24% sulfur, used on crops with high sulfur demand such as corn, soybeans, and canola.

33. Each Defendant is engaged in the manufacture and commercialization of nitrogenous fertilizers, offering overlapping product lines to farmers throughout the United States.

### 2. Phosphate Fertilizers

34. Phosphate fertilizers account for approximately 19% of total United States fertilizer consumption by volume and are essential for root development, energy transfer, seed formation, and crop maturation. Unlike nitrogen, phosphate does not volatilize from soil, but it binds tightly to soil particles and must be continuously replenished because each harvest removes significant quantities. Phosphate fertilizers are derived from mined phosphate rock—a non-renewable resource of which the United States holds important reserves, primarily in Florida and Idaho.

35. The primary phosphate fertilizer products include: (a) Diammonium Phosphate (DAP), the world's most widely traded phosphate fertilizer, containing 18% nitrogen and 46% $P_2O_5$ (phosphoric acid equivalent), used at planting for corn, soybeans, wheat, canola, and cotton;

9

(b) Monoammonium Phosphate (MAP), containing 11% nitrogen and 52% $P_2O_5$, used similarly to DAP and often preferred in alkaline soils and for fall application—MAP held the highest revenue share of phosphate products in 2021; (c) Triple Superphosphate (TSP), containing approximately 46% $P_2O_5$, used for high-phosphorus soils and specialty crops; (d) Single Superphosphate (SSP), a lower-concentration product (18-22% $P_2O_5$) used in cost-sensitive markets; and (e) Phosphoric Acid, the industrial intermediate used both in fertilizer manufacturing and in the production of processed foods and industrial chemicals.

36.     Four of the five named Defendants—Mosaic, Nutrien, Koch, and Yara—maintain a commercial presence within the phosphate segment. Mosaic and Nutrien operate as the preeminent phosphate producers. Mosaic, in particular, maintains the largest global production capacity for phosphate fertilizers, with its North American output exceeding the aggregate capacity of its three nearest competitors.

### 3. Potash Fertilizers

37.     Potash fertilizers account for approximately 22% of total United States fertilizer consumption by volume. Potassium is essential for water regulation, disease resistance, fruit quality, and overall plant health, and like phosphorus, is removed in significant quantities by each harvest. Potash is derived from mining of underground potassium-bearing mineral deposits and is irreplaceable as a crop input.

38.     The primary potash fertilizer products include: (a) Muriate of Potash (MOP), also known as potassium chloride (KCl), the most widely used potash fertilizer at approximately 60% $K_2O$ content, applied to corn, soybeans, wheat, cotton, and virtually all major row crops; (b) Sulfate of Potash (SOP), a premium product containing 50% $K_2O$ and 17% sulfur, used for chloride-sensitive crops such as fruits, vegetables, nuts, and tobacco where MOP's chloride content would

10

harm yield or quality; and (c) Sulfate of Potash Magnesia (SOPM or K-Mag), a specialty product used in high-value crops requiring simultaneous potassium, magnesium, and sulfur supplementation.

39.     Two of the five Defendants—Nutrien and Mosaic—produce and sell potash, and together they control almost all commercially relevant North American potash production capacity.

40.     The United States is almost entirely import-dependent for potash, obtaining more than 80% of its supply from Canada. Saskatchewan contains the world's largest known potash reserves, and Nutrien—through six mines with over 20 million tonnes of annual production capacity—is the dominant producer. Mosaic also maintains a meaningful presence in the sector, accounting for roughly 35% of North American potash output.

### 4. Fertilizer Used by Farmers

41.     Across all crop types, fertilizer costs represent one of the single largest variable expenses for American farmers, and there are no commercially viable substitutes for nitrogen, phosphate, and potash at meaningful commercial scale. This inelasticity of demand is a key economic characteristic that makes the fertilizer market particularly vulnerable to abuse by dominant producers.

42.     Farmers do not typically purchase raw elemental nitrogen, phosphorus, or potassium, nor do they buy unprocessed ore. Instead, they rely on finished fertilizer products produced by fertilizer producers, such as Defendants, that have been chemically processed, granulated, or liquefied so they can be safely transported, stored, blended, and applied with modern equipment. These products are engineered to flow through spreaders, dissolve in sprayers, or be injected into soil without causing equipment damage or safety hazards.

43.     Farmers also cannot—and do not—rely exclusively on a single nutrient fertilizer when farming crops (i.e., a farmer cannot rely solely on nitrogen fertilizer to grow corn). Rather, in practice, farmers purchase a mix of single-nutrient fertilizers and multi-nutrient blends depending on crop needs and soil conditions. Single-nutrient fertilizers, like urea, anhydrous ammonia, MAP, DAP, MOP, and SOP, supply one primary nutrient at a time and serve as the building blocks for more complex fertilizer programs. Farmers also buy pre-mixed NPK fertilizers that contain all three major nutrients in specific ratios. The numbers on an NPK label—such as 20-10-10—represent the percentage by weight of nitrogen (N), phosphate (P), and potash (K). A 20-10-10 blend therefore contains 20% nitrogen, 10% phosphate, and 10% potash, with the remaining 60% made up of filler material that ensures safe handling, prevents clumping, and allows for even application across a field.

44.     Each nutrient complements the effectiveness and crop yield of the other nutrients being used during a growing season. As a result, a farmer cannot, in response to a significant, non-transitory price increase of a single nutrient fertilizer, avoid purchasing that nutrient during a growing season. Doing so would come at the risk of lower crop yield or potentially, crop failure. Thus, farmers must purchase nitrogen, phosphate, and potash fertilizers during each growing season to maximize crop yield.

45.     Because fertilizers are standardized chemical products, single-nutrient fertilizers with the same formulation are generally interchangeable, regardless of which major producer manufactured them. For example, DAP produced by Nutrien, Mosaic, CF Industries, or Koch is chemically the same product and performs the same agronomic function. The same is true for urea, UAN, MAP, and potash.

46.     Similarly, pre-mixed NPK fertilizers with identical formulas—such as any

12

20-20-10 blend—are also reasonably substitutable, whether the underlying nutrients originated from Nutrien, Mosaic, or another supplier. This high degree of product uniformity means that, from the farmer's perspective, fertilizers with the same nutrient composition are effectively equivalent, and competition occurs primarily on price rather than on product differentiation.

**B.      United States Market Size and Structural Trends Over Time**

47.      The United States fertilizer market is one of the largest in the world, valued at approximately $30 billion in 2025 and projected to grow by another $10 billion by 2031.

48.      United States fertilizer consumption has trended significantly upward since 2009, driven by the expansion of crop acreage, increasing yields, and demand for renewable energy feedstocks such as corn ethanol. Total United States fertilizer consumption of nitrogen, phosphate, and potash reached 21 million metric tons in 2013—the highest since before the 2007 recession—before stabilizing at approximately 20 million metric tons through 2020. In 2021, total fertilizer consumption fell by 9.4% year over year to 18.3 million metric tons. Consumption has since rebounded, returning to roughly 20 million metric tons beginning in 2022.



49.    The United States fertilizer industry has undergone decades of consolidation, reducing the number of producers and increasing market concentration. Federal investigations and academic analyses have highlighted long-standing concerns that a shrinking number of firms exercise significant influence over fertilizer pricing. In 2019, just four corporations—CF Industries, Nutrien, Koch Industries, and Yara USA—represented 75% of the production and sale of nitrogen-based fertilizer in the United States. The number of firms producing ammonia, a key nitrogen source, has declined from over 40 companies in the late 1980s to fewer than 10 today.

14



50.    The formation of Nutrien through the January 2018 merger of PotashCorp and Agrium—at the time, the largest corporate transaction in Canadian history—dramatically increased concentration in the potash and phosphate markets. The merger was proposed in September 2016 during a period of depressed fertilizer prices, and industry analysts noted at the time that a combined entity would possess substantially greater ability to influence pricing. The Federal Trade Commission initially raised competition concerns before ultimately approving the transaction in December 2017. Although the merger was conditioned on divestiture of two production facilities, this remedy was wholly inadequate. Nutrien emerged from the acquisition as the world's largest potash producer and one of the largest nitrogen and phosphate producers, with market power in each segment that the divested facilities did nothing to constrain—and with the structural position that has enabled the anticompetitive conduct alleged herein.

51.    Similarly, Mosaic was created from the merger of IMC Global—a dominant North American phosphate producer—and Cargill's crop nutrition division, combining the two largest phosphate operations in North America under a single owner. Mosaic then methodically eliminated its remaining competition. In 2013, Mosaic acquired CF Industries' phosphate operations for

approximately $1.4 billion, eliminating CF Industries as an independent phosphate competitor, consolidating phosphate capacity, and acquiring CF's Florida phosphate processing infrastructure. This acquisition gave Mosaic direct control over additional processing capacity it would otherwise have needed to build—and removed a competitive threat in phosphate pricing.

52.    The following charts illustrate production capacity market shares for each of the three primary fertilizer nutrient markets. Together they demonstrate that the Defendants collectively dominate each market segment: the four Defendants hold approximately 82% of United States nitrogen production capacity; Mosaic and Nutrien together hold more than 90% of North American phosphate capacity; and Nutrien and Mosaic together hold approximately 88% of North American potash capacity. In each of the three markets that determine what American farmers pay to grow food, a handful of Defendants set the price. These concentration levels are the structural underpinnings of the conspiracy alleged herein.



Fig. 1. United States Nitrogen Fertilizer Production Capacity — Approximate Market Shares

53.    As illustrated in Figure 1, CF Industries is the dominant United States nitrogen

producer at approximately 39% of total domestic capacity—nearly twice the share of the second-largest producer. Nutrien holds approximately 22% and Koch approximately 15%, bringing the three Defendant nitrogen producers to a combined share of approximately 76%. Together with Yara (approximately 6%), the top four firms hold approximately 82% of United States nitrogen production capacity—a concentration ratio that, combined with high capital barriers to new entry and the energy-intensive cost structure of ammonia synthesis—gives Defendants substantial collective power over domestic nitrogen prices. CF Industries alone produces more than one-third of all nitrogen fertilizer manufactured in the United States.

54.    Defendants also exerted control over nitrogen imported to the United States. For example, in May 2022, Strike, an Australian urea producer, selected Koch Fertilizer LLC as the preferred bidder for the offtake of 100% of 1.4 million mt/y of nitrogen urea production.



Fig. 2. North American Phosphate Fertilizer Production Capacity—Approximate Market Shares

55.    Figure 2 illustrates the most extreme concentration of any of the three nutrient markets. Mosaic alone controls approximately 80% of North American phosphate fertilizer

production—a share so dominant that no other single producer, and no realistic combination of smaller producers, can exert meaningful competitive discipline on its pricing. Nutrien holds approximately 12% of North American phosphate production, and the remaining 8% is in the hands of fringe producers.



Fig. 3. North American Potash Production Capacity — Approximate Market Shares

56.     Figure 3 shows that the North American potash market is dominated by Nutrien (approximately 53% of production capacity) and Mosaic (approximately 35%), for a combined share of approximately 88%. The remaining 12% is split among small producers—primarily Intrepid Potash in the United States, whose capacity is negligible as a competitive constraint— meaning the Nutrien-Mosaic duopoly effectively sets potash prices for every United States farmer without facing any meaningful domestic competition. The United States is almost entirely import-dependent for potash, obtaining more than 80% of its supply from Canada; with Nutrien (the world's largest potash producer) controlling the majority of Canadian potash export capacity. Nutrien's dominant position in potash production gives it unparalleled ability to manage global potash supply and pricing—a power it exercised throughout the Class Period.

## C.    Vertical Integration and Distribution Channel Control

57.    Production-level dominance tells only part of the story. Over decades of mergers and acquisitions, Defendants have extended their control far beyond the mine and manufacturing plant, building vertically integrated systems that reach all the way to the farm gate. This integration—spanning production facilities, terminal networks, wholesale distribution, and direct retail—magnifies the anticompetitive effects of coordinated production decisions by creating additional channels through which pricing signals and supply-discipline strategies are transmitted directly to end-users without any independent intermediary to challenge them. And it also gives each Defendant real-time visibility into downstream demand, competitor inventory levels, and retail pricing across the market—a continuous intelligence stream that makes coordinated pricing easier to implement, easier to monitor, and harder for any deviation to go undetected.

58.    In January 2023, the USDA published survey results in response to the Public Request for Information on Access to Fertilizer.  Of the 1,494 comments submitted to the USDA, 87% of commenters described concerns about high prices, and 72% described concerns about the power of fertilizer manufacturers. Farmers attributed price increases to a few unaccountable fertilizer manufacturers who have extensive control over retail, transport, production markets, and "every step in the process," with one commenter saying that "[e]xcessive price increase of fertilizer appears to be fueled by greed within the small group of fertilizer manufacturers."

59.    Commenters pointed out how some manufacturers may have business lines as, for example, fertilizer seller and retailer buyer; this gives them power to "force other [retailers dependent on the manufacturer's product] to buy at inflated prices." Regarding fertilizer distribution, the USDA found that one commenter described how: "'large distributors' are 'acquiring small manufacturers'; and 'effectively lock[] up retail locations from being approached'

by competitor manufacturers, by 'eliminating competing products from [acquired manufacturers' catalog and consolidate to one product]' and 'forc[e downstream] retail locations to place large minimum orders.'"

60. **Nutrien.** Nutrien, the world's most extensively vertically integrated fertilizer company, illustrates the devastating effects on competition when consolidation and vertical integration join forces. Nutrien controls its full supply chain from the mine to the farmer's gate. In addition to operating six potash mines in Saskatchewan with over 20 million tonnes of annual capacity, Nutrien also produces approximately 27.5 million tonnes of fertilizer products annually. In addition, through its retail subsidiary, Nutrien Ag Solutions, Nutrien is the largest agricultural retailer in the United States, with annual sales exceeding $1 billion from retail operations alone. It currently accounts for approximately 21% of all United States agricultural retail sales, with a significant majority of its fertilizer sales generated from its own production—creating a vertically integrated, self-reinforcing structure that entrenches its market power.

61. The anticompetitive significance of this vertical structure is direct: a significant majority of the fertilizer sold through Nutrien Ag Solutions retail locations is sourced from Nutrien's own production facilities. When Nutrien raises wholesale fertilizer prices—as it did throughout the Class Period—its retail arm simultaneously transmits those price increases to hundreds of thousands of farmers, with no independent retail competitor able to undercut it using lower-cost alternative supply. The price increase originates at Nutrien's mine or plant, travels through Nutrien's distribution network, and lands at the farmer's gate through Nutrien's retail counter. No independent hand touches it at any point. Nutrien's retail operations also generate granular, real-time visibility into national and regional fertilizer demand, competitor product presence at the farm level, and farmer purchasing behavior—a proprietary commercial intelligence

20

stream that tells Nutrien exactly what the market will bear and whether any competitor is deviating from coordinated price levels. Even as Class Period prices were peaking in July 2022, Nutrien continued its vertical integration expansion by announcing the acquisition of Casa do Adubo, a Brazilian retail fertilizer company, extending its mine-to-farm-gate integration into the Brazilian agricultural market.

62.     **Mosaic.** Mosaic is vertically integrated at the production, logistics, and international distribution levels. The merger that created Mosaic combined IMC Global's mining and processing operations with Cargill's distribution infrastructure and customer network, giving the newly formed company control over both the production and the downstream delivery of North American phosphate from day one.

63.     At the domestic logistics level, Mosaic owns and operates ammonia terminating facilities at the Port of Tampa and Port Sutton, Florida, through which it receives and processes ammonia inputs to its phosphate manufacturing operations—giving it control over a critical production input that would otherwise depend on third-party infrastructure. Mosaic's global network of crop nutrient blending and bagging facilities spanning the United States, Canada, Brazil, and other international markets provides additional downstream reach that independent fertilizer distributors cannot easily replicate. Mosaic's vertically integrated operations, from mine through finished granule and port terminal, constitute a physical infrastructure network that gives it structural advantages over any new entrant attempting to compete from a production-only basis.

64.     **CF Industries.** CF Industries does not operate a consumer-facing agricultural retail network, but its vertical integration is achieved through a strategically positioned infrastructure of production facilities, pipeline assets, and distribution terminals that give it direct control over the movement and pricing of nitrogen fertilizers from the point of production to the point of sale. Its

Donaldsonville, Louisiana complex—the single largest ammonia production complex in the world—is connected to an extensive pipeline system that feeds nitrogen products directly into the Midwest market. CF Industries has access to a 2,000-mile ammonia pipeline and owns terminal and storage facilities across the Midwestern United States that allow it to supply multiple terminal locations without dependence on third-party logistics.

65.     CF Industries also operates or holds interests in a network of storage and distribution terminals across the Corn Belt and Gulf Coast.

66.     **Koch.** Koch is similarly vertically integrated. Koch owns major ammonia pipeline running from Gulf Coast production facilities into the Corn Belt—along with the ammonia terminals connected to it. This acquisition gave Koch control over critical last-mile nitrogen delivery infrastructure before Koch was even a primary nitrogen producer. In 2022, Koch acquired 50% interest in Jorf Fertilizers Company III, the world's largest phosphate mining group.

67.     Koch continued its vertical expansion in 2024 by completing the acquisition of a nitrogen fertilizer plant in Wever, Iowa. This acquisition gave Koch control of the largest nitrogen facility in the world and left lawmakers and farmers disappointed because they were hoping for more competition in the market to keep prices down. Koch maintains a global network of 50+ terminals that allows it to source product from its own production facilities or from third-party suppliers and to direct supply toward whichever market presents the most favorable pricing opportunity at any given time—allowing it to manage supply levels and support supracompetitive prices in target markets.

68.     **Yara.** Yara's vertical integration in the United States market is achieved through its ownership and operation of the Freeport, Texas nitrogen production complex and a network of distribution terminals across the United States and Canada. Yara North America's terminal

22

network enables it to control the timing and pace of product releases to the domestic market, giving it the same structural ability to manage supply and support price levels that characterizes the vertical infrastructure of its co-conspirators. Yara's global scale reinforces this domestic market power: as the world's largest nitrogen fertilizer producer, Yara has the ability to source product from its global production network and direct it toward, or withhold it from, the United States market depending on pricing conditions. This gives Yara leverage over domestic nitrogen prices beyond its Freeport capacity alone. Yara North America's direct-to-retailer distribution relationships provide access to the same downstream commercial intelligence about demand, inventory, and competitor pricing that its co-Defendants obtain through their own vertically integrated distribution systems, further enabling coordinated conduct.

**D.     Defendants' Conspiracy Drove Fertilizer Prices to Supracompetitive Levels That Cannot Be Explained by Supply and Demand or Other Legitimate Market Forces**

**1. Defendants' Parallel Pricing Caused Fertilizer Costs to Skyrocket**

**a. The Price Surge: Magnitude, Synchrony, and Persistence**

69.     Fertilizer prices are subject to natural cyclical variation tied to global supply, energy costs, and crop demand. The price increases that began at the beginning of 2021 and accelerated sharply through 2021 and 2022, however, were extraordinary in their scale and their simultaneous occurrence across all three nutrient categories. Moreover, these increases persisted long after every conventional cost-based explanation had been exhausted. Figure 4 below charts the monthly average United States price per metric ton for DAP, urea, potash/MOP, and anhydrous ammonia for 2019 through 2025. The dotted horizontal reference lines mark each product's 2019 pre-conspiracy baseline price, providing an immediate visual comparison of the scale of the departure from competitive norms.



Fig. 4. United States Fertilizer Prices, January 2019 – December 2025. Source: USDA Agricultural Marketing Service (AMS), Illinois Production Cost Report (Bi-weekly). All prices in USD per short ton, Illinois statewide average, FOB distributor. Dashed lines mark each product's 2019 annual average baseline.

70.     The numbers are stark. All four fertilizer products moved through essentially the same four phases in synchronized fashion: (1) a period of relative calm in 2020; (2) a sharp, coordinated escalation beginning in 2021; and (3) peak in early-to-mid 2022 at prices that were multiples of their pre-conspiracy 2019 baselines; and (4) then a partial decline that never returned prices to baseline levels. The fact that four distinct products tracked each other through the same inflection points with near-identical timing is a hallmark of coordinated market behavior rather than independent responses to separate competitive forces.

71.     Throughout 2020, prices for all four products remained near or below their 2019 baselines. The price shock began in early 2021. By January 2022, anhydrous ammonia had reached $1,497/ton—a 163% premium over the 2019 baseline. It peaked at $1,636/ton in June 2022—a 188% premium. Urea surged to $1,027/ton in April 2022—a 155% premium. DAP peaked at

24

$1,028/ton in June 2022—a 110% premium over baseline. Potash peaked at $864/ton in June 2022—a 125% premium. All four products reached their peaks within the same narrow April–June 2022 window.

72.    The synchronization of peaks across all three fertilizer nutrients—nitrogen (anhydrous and urea), phosphate (DAP), and potash (MOP)—in the same narrow three-month window constitutes powerful circumstantial evidence of coordinated pricing among Defendants. Anhydrous ammonia, urea, DAP, and potash have entirely different feedstock inputs, production processes, and global trade dynamics. No natural market mechanism—not weather, not a single input-cost shock, not any discrete geopolitical event—simultaneously accelerated the prices of a natural gas-intensive product (ammonia/urea), a sulfuric acid- and phosphate rock-intensive product (DAP), and a mining-intensive product (potash) within the same three-month window. The only mechanism capable of producing such synchronized escalation across independent industrial processes is the conspiracy among Defendants, who collectively control the pricing of all NPK fertilizers in the United States market.

73.    The post-peak behavior of prices is equally probative of coordination. After reaching their 2022 highs, prices declined throughout 2023 and into 2024—but none returned to pre-conspiracy levels. By December 2024, anhydrous ammonia stood at $692/ton—22% above the 2019 baseline of $569/ton. Urea was at $538/ton—34% above its 2019 baseline of $402/ton. DAP was at $724/ton—48% above its 2019 baseline of $489/ton. Potash remained at $456/ton—19% above its 2019 baseline of $384/ton. Notably, the decline from peak to late-2024 levels was far more gradual than the ascent: ammonia took more than two years to fall from its $1,636 peak to the $700 range, remaining above $1,000/ton through at least mid-2023.

74.    Then, in 2025, rather than completing their return to competitive equilibrium, prices

resumed an upward trajectory across all four products simultaneously: anhydrous ammonia climbed from $722/ton in January to $844/ton by December 2025; urea rose from $538/ton to $599/ton; DAP rose from $726/ton to $861/ton; and potash increased from $457/ton to $496/ton.

75.     These inflated prices persist and are actively harming American farmers. In 2025, there was a 46% increase in farmer bankruptcies in the United States. In July 2025, the Argus Fertilizer affordability index stood at 0.71, "well below the baseline of 1," which means that a farmer would need to sell 206 bushels of corn to afford one short ton of DAP, compared to the historical average of 133 bushels.

76.     This pattern—partial retreat followed by renewed coordinated escalation—is the hallmark of ongoing conspiracy among Defendants, not the operation of competitive markets.

### b. Defendants Implemented Parallel Price Increases and Inflated Prices to Supracompetitive Levels During the Class Period

77.     Defendants' public financial disclosures show that Defendants executed price increases in parallel. The pricing data drawn from Defendants' own financial disclosures confirms that average realized prices for nitrogen, phosphate, and potash products moved in near-perfect parallel across Defendants Nutrien, CF Industries, and Mosaic from 2021 through 2025, with each product peaking within the same narrow window and each Defendant's prices tracking its competitors with a precision that is irreconcilable with independent competitive pricing.[2] The price movements of these Defendants' products are plotted in Figure 5 below.

---

[2] Koch Fertilizer is a private company and Yara International is a foreign entity that does not disclose price data in their investor reports.



Fig. 5: Defendant Average Realized NPK Prices (2018-2025)[3]

78.    The potash and phosphate data is striking. As shown in Figure 6 below, Nutrien

and Mosaic—the two companies that together control more than 90% of North American potash

---

[3] For Nutrien, the analysis covers average realized prices across all three of its primary fertilizer product lines — potash, phosphate, and nitrogen. The potash price data reflects North American sales only, consistent with Nutrien's segment reporting. Nutrien's phosphate price data reflects the entire company, as its phosphate operations are heavily concentrated in North America and supplemented by exports to global agricultural markets. Nutrien's nitrogen price data likewise reflects the entire company; however, Nutrien sells the substantial majority of its nitrogen products within North America, making its total nitrogen figures a reliable proxy for its North American market pricing.

For Mosaic, the price analysis is limited to Mosaic's North America segment — which encompasses its potash and phosphate sales operations in the United States and Canada — and excludes Mosaic's South America segment, known as Fertilizantes, which operates as a distinct regional business serving different agricultural markets. The North America segment does include a portion of exports to Asia, but the dominant share of its sales activity is directed to North American agricultural markets.

For CF Industries, the analysis reflects average realized prices across the entire company's nitrogen product lines. CF Industries is the most geographically concentrated of the three public Defendants, with the substantial majority of its production and sales conducted in North America; the United States typically accounts for the largest share of CF Industries' sales volumes. CF Industries does operate nitrogen production assets in the United Kingdom and sells that product into European markets, but those operations represent a modest share of total company output and do not materially affect the North American pricing trends documented herein.

and phosphate production capacity—reported average realized prices that tracked each other almost exactly throughout the entire Class Period.



Fig. 6: Nutrien v. Mosaic Average Realized Potash Prices (2018-2025)

79.     Nutrien's average realized potash price rose from $192/MT in Q4 2020 to $684/MT in Q1 2022, a 256% increase over six quarters. Mosaic's average realized potash price rose from $176/MT in Q4 2020 to $582/MT in Q1 2022, a 231% increase over the same period.

80.     On June 22, 2022, Mosaic announced that its potash prices were $100-120/mt higher in the second quarter of 2022 compared to the first.

81.     Potash fill pricing in Midwest terminals for orders placed by August 3, 2022 were between $760-765/st.  "After that date, both Nutrien and Mosaic said pricing for new orders will be up $35/st."

82.     Both producers reached their absolute peak in the identical quarter: Nutrien at $729/MT in Q2 2022 and Mosaic at $678/MT in Q2 2022, a spread of only 7.5% between the two

dominant producers at the height of the market.

83.    Not only did Mosaic and Nutrien price in parallel, but on Nutrien's Q1 2024 earnings call, an analyst "noticed that Mosaic and [Nutrien] had identical messaging on potash pricing."

84.    As of Q4 2025, Nutrien's average realized potash price of $305/MT remained 35% above its pre-conspiracy Q4 2019 baseline of $226/MT, and Mosaic's price of $264/MT remained 18% above its Q4 2019 baseline of $224/MT.

85.    The two dominant potash producers, operating independently in a competitive market, would have strong incentives to undercut each other to capture market share at historically profitable prices. Instead, their average realized prices moved in lockstep, rising together, peaking together, and declining together, without any meaningful divergence and throughout the conspiracy period.

86.    The same pattern holds for phosphate, as shown in Figure 7 below.



29

Fig. 7: Nutrien v. Mosaic Average Realized Phosphate Prices (2018-2025)

87.     Nutrien's average realized phosphate price rose from $305/MT in Q1 2020 to a peak of $888/MT in Q2 2022, a 191% increase. Mosaic's average realized phosphate price rose from $274/MT in Q1 2020 to a peak of $920/MT in Q2 2022, a 236% increase. Both producers reached their absolute peak in the identical quarter.

88.     On June 22, 2022, Mosaic announced that its phosphate prices were $130-150/mt higher in the second quarter of 2022 compared to the first.

89.     As of Q4 2025, Nutrien's average realized phosphate price of $677/MT remained 103% above its pre-conspiracy Q4 2019 baseline of $334/MT, and Mosaic's price of $686/MT remained 158% above its Q4 2019 baseline of $266/MT. The lowest post-peak phosphate price recorded by either producer was Nutrien's $472/MT in Q3 2023, which still remained 43% above Nutrien's 2020 average of $330/MT. Mosaic's post-peak low of $487/MT in Q3 2023 remained 83% above its Q4 2019 baseline. Neither producer came close to returning to pre-conspiracy price levels at any point following the 2022 peak.

90.     The nitrogen pricing data tells the same story across two independent producers, Nutrien and CF Industries, as shown in Figure 8 below.

30



Fig. 8: Nutrien v. CF Industries Average Realized Ammonia Prices (2018-2025)

91.    For ammonia, Nutrien's average realized ammonia price rose from $216/MT in Q4 2020 to a peak of $1,157/MT in Q2 2022, a 436% increase. CF Industries' average realized ammonia price rose from $273/MT in Q4 2020 to a peak of $1,077/MT in Q2 2022, a 294% increase. Both producers reached their absolute peak in the same quarter, with a spread of only $80/MT—approximately 7%—between the two largest United States nitrogen producers at the height of the market.

92.    From Q1 2021 through Q4 2022, Nutrien and CF Industries moved their ammonia prices in the same direction in 6 out of 7 consecutive quarterly transitions. The single divergent quarter—Q3 to Q4 2022, when Nutrien declined from $927/MT to $887/MT while CF Industries rose from $826/MT to $898/MT—reflects a brief and temporary divergence as the two producers converged from slightly different post-peak trajectories, rather than any genuine competitive differentiation.

31

93.    Notably, Koch also priced in parallel alongside Nutrien and CF Industries. On December 9, 2022, ammonia prices ranged from $1,210-1260/st in the Western Cornbelt (Iowa, Nebraska, and South Dakota) with "the high reflecting the last offers from Koch and CF terminals."

94.    As of Q4 2025, Nutrien's average realized ammonia price of $470/MT remained 92% above its pre-conspiracy Q4 2019 baseline of $245/MT, and CF Industries' price of $557/MT remained 103% above its Q4 2019 baseline of $275/MT, despite natural gas prices having returned to near-2020 lows. The lowest post-peak ammonia price recorded by either producer was Nutrien's $272/MT in Q3 2023, which still exceeded Nutrien's full-year 2020 average of $221/MT by 23%. CF Industries' post-peak low of $308/MT remained 16% above its 2020 average. Neither producer returned to pre-conspiracy ammonia price levels at any point following the 2022 peak.

95.    During Q1 2021 through Q4 2025, the average quarterly price difference between Nutrien and CF Industries ammonia narrowed to approximately $36/MT, down from approximately $53/MT during the pre-conspiracy period from Q1 2018 through Q4 2020—a tightening of competitive alignment that occurred precisely as prices tripled and the financial incentive to undercut a competitor was greatest.



Fig. 9: Nutrien v. CF Industries Average Realized Urea Prices (2018-2025)

96.    For urea, Nutrien's average realized price rose from $270/MT in Q4 2020 to a peak of $783/MT in Q1 2022, a 190% increase. CF Industries' average realized urea price rose from $247/MT in Q4 2020 to a peak of $705/MT in Q2 2022, a 185% increase, with both producers reaching their peaks within one quarter of each other.

97.    From Q1 2021 through Q4 2022, Nutrien and CF Industries moved urea prices in the same direction in 6 out of 7 consecutive quarterly transitions. As of Q4 2025, Nutrien's average realized urea price of $505/MT remained 82% above its pre-conspiracy Q4 2019 baseline of $278/MT, and CF Industries' price of $434/MT remained 76% above its Q4 2019 baseline of $247/MT. The lowest post-peak urea price recorded by either producer was CF Industries' $330/MT in Q3 2024, which remained 36% above CF Industries' full-year 2020 average of $242/MT. Nutrien's post-peak low of $396/MT remained 42% above its Q4 2019 baseline. Neither producer returned to pre-conspiracy urea price levels at any point following the 2022 peak.

98.    The failure of average realized prices to return to competitive levels, across every product, every Defendant with available pricing data, and every nutrient category, despite the near-complete normalization of input costs by 2023 and 2024, confirms that the supracompetitive pricing documented in Defendants' own financial statements reflects persistent coordinated market power, not temporary responses to exogenous cost shocks.

### c. Defendants' Parallel Pricing During the Class Period is Proven by Statistical Analysis

99.    The parallel pricing behavior documented in Defendants' own SEC filings is not merely a visual pattern—it is statistically demonstrable through standard econometric analysis applied to Defendants' average realized price data across all four product categories. That analysis confirms, with a precision that forecloses any innocent explanation, that Nutrien, CF Industries, and Mosaic priced their fertilizer products in near-perfect coordination throughout the Class Period.

100.    The most fundamental measure of pricing coordination is the Pearson correlation coefficient, which measures the degree to which two variables move together over time. A correlation of 1.0 indicates perfect parallel movement; a correlation of 0.0 indicates no relationship. In competitive commodity markets characterized by independent pricing, correlations between competing producers' prices typically range from 0.3 to 0.7, reflecting the normal influence of shared input costs and broad market trends while still capturing meaningful independent price variation between competitors. The correlation coefficients between Defendants' average realized prices for the same product far exceed that competitive benchmark across every product category. For ammonia, the correlation between Nutrien's and CF Industries' average realized prices across the full dataset is 0.9920—near-perfect parallel pricing. For urea, the correlation is 0.9863. For potash, the correlation between Nutrien and Mosaic is 0.9800. For

phosphate, the correlation between Nutrien and Mosaic is 0.9903. Every product comparison produces a correlation above 0.98—a level of pricing alignment that, benchmarked against the 0.3 to 0.7 range expected of independent competitors, confirms that these companies were not pricing independently of one another.

101.    The quarter-over-quarter directional analysis reinforces this conclusion. In a market characterized by independent competitive pricing, two producers would be expected to raise or lower prices in the same direction in approximately 50% of quarters—the baseline probability of any random directional match. The actual match rates between Defendants are dramatically higher. Nutrien and CF Industries moved ammonia prices in the same direction in 28 out of 31 comparable quarters, a match rate of 90.3%. They moved urea prices in the same direction in 27 out of 31 quarters, a match rate of 87.1%. Nutrien and Mosaic moved potash prices in the same direction in 24 out of 27 quarters—88.9% —and phosphate prices in 25 out of 27 quarters—92.6%. Match rates of 87% to 93% against a competitive baseline of 50% confirm that Defendants' quarterly pricing decisions were not independent.

102.    The price gap stability analysis provides a third and independently probative measure of coordination. In competitive markets, the price gap between two producers of the same fungible commodity fluctuates significantly over time as each producer responds to its own cost pressures, capacity utilization, and competitive position. A stable, narrow price gap—one that persists across years and across dramatically different absolute price levels—is inconsistent with independent pricing and consistent with coordination. Across every product comparison, the price gap between Defendants remained remarkably stable throughout the Class Period.

103.    For ammonia, the mean price gap between Nutrien and CF Industries was $43/MT, representing a mean percentage gap of only 11.3%, with a coefficient of variation of 0.68—

35

indicating that the gap was not only narrow but stable relative to its mean. For urea, the mean gap was $47/MT at 11.8%, with a coefficient of variation of 0.58. For potash, the mean gap between Nutrien and Mosaic was $38/MT at 12.0%.

104.    For phosphate—where Mosaic produces nearly five times Nutrien's volume—the mean gap was only $29/MT, representing a mean percentage gap of just 5.8%, with a coefficient of variation of only 0.62. The phosphate figure is particularly striking: two producers whose output differs by a factor of nearly five maintained an average price gap of less than 6% across 27 quarters spanning a period in which their absolute prices ranged from approximately $266/MT to $920/MT. That level of pricing alignment between producers of fundamentally different scale is not a feature of competitive markets. It is the signature of coordination.

105.    The key pricing episodes during the Class Period further illustrate the coordinated nature of Defendants' conduct. During the four quarters of Q1 2021 through Q4 2021—the initial escalation phase of the conspiracy—Nutrien raised its average realized ammonia price from $278/MT to $656/MT, a 136% increase, while CF Industries simultaneously raised its ammonia price from $302/MT to $659/MT, a 118% increase over the same four quarters. Both producers then reached their absolute ammonia price peaks in the identical quarter— Q2 2022—with Nutrien at $1,157/MT and CF Industries at $1,077/MT, a spread of only $80/MT or approximately 7% at the highest price levels in decades. Neither producer attempted to capture market share by undercutting the other at the peak. The parallel descent was equally synchronized: from Q3 2022 through Q4 2023, Nutrien's ammonia price fell from $927/MT to $416/MT over six quarters while CF Industries' fell from $826/MT to $460/MT over the same six quarters—neither producer cutting aggressively to gain share during the decline.

106.    The urea episode mirrors the ammonia pattern precisely: from Q1 2021 through Q4

2021, Nutrien raised urea prices from $329/MT to $670/MT, a 104% increase, while CF Industries simultaneously raised urea prices from $302/MT to $650/MT, a 115% increase—near-identical escalation across a product whose price should, in a competitive market, be determined by each producer's independent cost and capacity position.

107. For potash and phosphate, Nutrien and Mosaic prices surged 55-70% in near unison over eight quarters from Q1 2021 through Q4 2022, despite operating mines and production facilities with entirely different cost structures, geographies, and operational circumstances. The most recent data—Q1 2025 through Q4 2025—confirms the conspiracy remains ongoing: Nutrien maintained ammonia prices between $400/MT and $470/MT while CF Industries maintained prices between $418/MT and $557/MT, reflecting continued price discipline with minimal competitive divergence.

108. Taken together, the price correlation analysis, the directional synchronization analysis, the price gap stability analysis, and the key episode documentation constitute a statistically rigorous and mutually reinforcing body of evidence that Defendants' pricing during the Class Period was coordinated rather than independent. No combination of shared input costs, common demand conditions, or rational oligopolistic awareness can explain correlation coefficients above 0.98, directional match rates above 87%, and mean price gaps below 12% between producers whose production levels, cost structures, and operational circumstances differed materially throughout the period. The statistical record is consistent with one conclusion: Defendants priced their fertilizer products in coordination, not in competition.

### d. Raw Material and Supply Chain Costs Cannot Explain the Dramatic Price Surge

109. Defendants have at times attributed Class Period prices to a series of overlapping supply shocks such as the February 2021 Texas winter storm (Winter Storm Uri) that froze natural

gas wells and briefly curtailed ammonia production; European energy-crisis-driven nitrogen plant curtailments in late 2021–2022; European Union and United States sanctions on Belarus beginning in August 2021 that disrupted approximately 20% of global potash exports; Chinese export restrictions on phosphate and urea imposed in the second half of 2021; and the Russian invasion of Ukraine in February 2022, which disrupted ammonia, urea, and potash supply chains. While these events did occur and may have caused some price effects, a careful empirical comparison of cost movements and price movements—illustrated in Figure 10 below—demonstrates that none of them (individually or in combination) can account for what actually happened to fertilizer prices. At best, these events gave convenient pretext for the price increases caused by Defendants' underlying conspiracy.

110. Natural gas is the dominant variable-cost input for nitrogen fertilizers. When natural gas prices were high in 2021, CF Industries CEO W. Anthony Will admitted "the steeper global cost curve increased margin opportunities for low-cost producers such as CF" and other major fertilizers producers. Yet, throughout the Class Period, Defendants publicly attributed fertilizer price increases to rising natural gas costs. Figure 10 directly tests that claim: it quantifies the disconnect between natural-gas input costs and urea prices in the United States market, demonstrating that Defendants' cost-pass-through explanation cannot account for either the magnitude or the persistence of the Class Period price increases.



Fig. 10. Actual United States Urea Prices vs. Expected Urea Prices Based on World Natural Gas Costs, 2019–2026.[4]

111.    Figure 10 compares actual United States urea prices paid by fertilizer purchasers (red line) with the price that urea should have cost based on natural gas prices—the primary raw material used to produce urea (blue line). The shaded gray area between the two lines represents the portion of urea prices that natural gas costs cannot explain. It shows, across the Class Period, the United States urea price has been on average $122.88 per ton more than would be anticipated

---

[4] Figure 10 uses an index of Bloomberg series GCFPURCA, GCFPURCD, GCFPURWC, GCFPURWS, GCFPURGI, GCFPURMC, GCFPURNP, GCFPURND, GCFPURNE, GCFPURPD, GCFPURPW, GCFPURSC, GCFPURSE, GCFPURSP, and GCFPURGL from April 2019 to December 2025 and BLS series PNGASEUUSDM. The Urea price index is regressed on the world natural gas price index for 2019 and 2020 which is then projected using the estimated coefficients for the full time period.

based on the input price of natural gas—a persistent gap that, applied across the millions of tons of urea sold to American purchasers.

112.    Before the alleged conspiracy, from 2019 through 2020, the model behaved exactly as expected in a competitive market: the red and blue lines moved together, both fluctuating between roughly $275 and $350 per ton. Sometimes actual prices were slightly above the gas cost prediction, sometimes slightly below—normal, short-lived deviations consistent with competitive commodity pricing.

113.    That pattern broke in early 2021. Actual urea prices diverged sharply from the cost predicted price. By mid-2022, some fertilizer purchasers were paying nearly $1,000 per ton for urea, even though natural gas costs justified only about $650 per ton—a gap of roughly $350 per ton. In other words, rising natural gas costs—the justification Defendants repeatedly offered for the 2021–2022 price spikes—explain only a fraction of the increase. The remainder reflects a substantial and sustained departure from competitive market behavior.

114.    What happened after the 2022 peak is even more telling. Natural gas prices fell sharply through 2023 and 2024, and the gas cost predicted urea price dropped accordingly to roughly $350–$375 per ton. Actual urea prices, however, remained between $400 and $530 per ton—a persistent $50–$150 premium—month after month, for two consecutive years. Then, in 2025, the gap widened further: actual urea prices rose to $470–$620 per ton, while cost predicted prices remained around $350–$375 per ton, despite moderate natural gas prices and fully normalized supply chain conditions.

115.    A temporary cost shock produces a gap that narrows over time. A coordinated pricing strategy produces a gap that persists—or grows. That is exactly what occurred here: Defendants continued to price urea far above cost justified levels for years, creating a sustained

40

and expanding margin that natural gas costs cannot explain.

116. Similarly, in 2024, economists from Texas A&M University's Agricultural and Food Policy Center published a paper examining fertilizer market conditions. The Texas A&M paper concluded that "increases in the cost of natural gas prices explained less than 20% of the increase in fertilizer prices paid by producers in 2022."

117. The supply-chain disruptions Defendants invoke share a common deficiency: each was temporary or limited in scope, yet the pricing effects persisted years beyond the underlying event. Winter Storm Uri struck in February 2021 and lasted less than a week. Chinese fertilizer export restrictions began in mid-2021 but primarily affected trade flows to Asia and Latin America; the United States produces the vast majority of its phosphate domestically through Mosaic and imports virtually no phosphate from China. Belarus potash sanctions disrupted some global trade routes but did not eliminate supply, as Belarus and Russia found alternative export channels. The Russia-Ukraine conflict began on February 24, 2022—yet fertilizer prices had already doubled or tripled from their 2019 baselines before the invasion. The price surge was well underway before the conflict began. None of these disruptions can explain why, by late 2024, with natural gas prices below 2019 levels and no new supply shocks, all four fertilizer products remained 19–76% above their pre-conspiracy baselines—and were rising again. Temporary supply disruptions do not produce permanent price floors. Coordinated pricing discipline does.

118. This imbalance is not limited to just natural gas and nitrogen. The cost-input calculations do not add up for phosphate either. For example, in June 2022, Peruvian farmers asked Peruvian authorities to renegotiate the Bayover mine phosphate deposit contract. Bayover mine's concessionaire is Miski Mayo, an entity controlled by Mosaic. Climaco Cardenas, President of Agriculture Association Conveagro stated that "[t]hey pay $2.90 for one ton of phosphate rock,

and we pay $900 per ton of fertilizer." This reflects a markup of over 300x the cost of the raw input to phosphate. Upon information and belief, a similar price-cost disconnect exists for potash.

### e. Defendants Pegged Their Prices to Farmers' Maximum Ability to Pay, Not to Legitimate Market Forces.

119.    Perhaps the most economically revealing aspect of Defendants' pricing conduct is the systematic correlation between fertilizer prices and corn prices during the Class Period. This correlation resulted from Defendants' common shift to an ability-to-pay pricing model.

120.    In a competitive market, the price of a commodity good such as fertilizer is determined primarily by its cost of production— natural gas for nitrogen, phosphate rock and sulfuric acid for DAP, mining and processing costs for potash—not by what farmers can afford to pay. In particular, as basic microeconomic theory confirms, if the fertilizer market were truly competitive, the price of fertilizer should not systematically track the price of downstream crops (such as corn). The reason is straightforward: a corn farmer's profitability does not change Defendants' cost of production, such as the cost of synthesizing ammonia from natural gas. In a competitive industry, no producer can charge more than its cost plus a normal return because rivals would undercut it and capture its customers.

121.    A coalition of twenty-four agricultural organizations, including the Indiana, Ohio, and Wisconsin Farmers Unions, submitted formal comments to the USDA documenting their finding that fertilizer companies peg their prices to the sale price of grain rather than to their production costs. The coalition stated: "In effect, these corporations are tying the price of their products to the farmer's ability to pay, rather than to supply and demand—which equates to an abuse of the market. Such abuses allow concentrated corporations to extract maximum profit out of the supply chain, leaving the farmer with no hope of profitability." This illustrates the disconnection between raw material costs and Defendants' finished product prices.

42

122. One farmer submitted a comment to the USDA stating directly: "The price of fertilizer today is set by the producers depending on what the price of corn and beans happens to be." This farmer-level observation is precisely consistent with what economic theory predicts when a firm has market power and practices "demand-based pricing"—pricing not to cost but to what the market will bear.

123. A 2024 peer-reviewed study published in the Journal of Agricultural and Applied Economics Association (Wongpiyabovorn et al., 2024) examined five structural breaks in the relationship between natural gas, corn, and fertilizer prices from 1997 to 2022. This study found that pass-through rates of natural gas price changes to fertilizer prices showed significant shifts after the biofuel mandate era, with natural gas remaining a contributing factor in the most recent period but with a relationship that continues to evolve. Critically, the study confirmed that demand-side pressures—driven by corn prices—were identified as significant drivers of fertilizer pricing in multiple structural periods, reflecting fertilizer producers' ability to extract rents tied to crop profitability rather than their own production costs.

124. Defendants have publicly attributed the Class Period price increases, in part, to increased demand driven by rising crop prices: higher corn and soybean prices, they contend, incentivized farmers to plant more acres, which in turn increased fertilizer demand and justified higher fertilizer prices. This defense is contradicted by the empirical record. Three independent lines of publicly available USDA data demonstrate that demand shifts cannot explain the magnitude, duration, or pattern of the Class Period price increases.

125. First, United States crop acreage—the most direct measure of agricultural demand for fertilizer—was essentially flat during the period in which fertilizer prices tripled and quadrupled. Figure 11 below indices total United States corn plus soybean planted acres alongside

43

fertilizer prices to a common 2019 baseline of 100. Total corn and soybean planted acreage ranged from approximately 165.8 million acres to 180.6 million acres between 2019 and 2025—a maximum variation of approximately 9% from the 2019 baseline. Over the same period, anhydrous ammonia prices surged 160% above baseline, urea prices surged 119%, and DAP prices surged 90%. If increased demand (i.e., more acres planted) were the driver of higher fertilizer prices, one would expect the acreage line and the price lines to move together. They do not. The acreage line is essentially flat while the price lines spike and diverge dramatically—a pattern that is inconsistent with demand-pull pricing and consistent only with supply-side pricing power.



Fig. 11. Total United States Corn + Soybean Planted Acres vs. Fertilizer Prices (Indexed to 2019 = 100). Sources: USDA NASS Acreage Reports (corn and soybean planted acres); USDA AMS Illinois Production Cost Report (fertilizer prices).

126.    The economic literature on agricultural input market power further confirms this pattern. The American Antitrust Institute has published research finding that fertilizer pricing behavior is more consistent with coordinated oligopoly than with competition. The AAI notes that

44

corn growers face a "margin squeeze"—paying higher prices to a small group of powerful input suppliers while selling into commodity markets where prices fluctuate independently. As Midwestern farmers spent nearly $4 out of every $10 of corn production costs on fertilizer in 2021, the ability-to-pay pricing mechanism transferred a massive and disproportionate share of farmers' commodity price gains directly to Defendants' bottom lines.

127.    Statements made by Defendants' executives during earnings calls further corroborate their common scheme to extract as much as possible from farmers. In Q1 2021, Mosaic's CEO publicly acknowledged that "price increases for the integrated producers have largely outpaced production cost increases" and that "grower demand for fertilizer is relatively price inelastic." Also, CF Industries' CEO admitted that market conditions created "a very good platform for a very healthy floor level, probably higher than what people are anticipating" and the floors "will be positive" for large producers like CF Industries and the Defendants.

128.    During a Q2 2021 earnings call, when asked about desired potash pricing on a go-forward basis, Nutrien's CEO Schmidt responded: "We are enjoying some prices and we want to continue to enjoy these prices and that's how we are going to think about servicing our growers, to keep them in the game and price accordingly"—explicitly calibrating fertilizer prices to farmers' capacity to absorb price increases rather than to Defendants' own production costs.

129.    In a Q3 2021 earnings call, Mosaic's CEO said that the current market position of high demand and low supply meant "further upside in realized pricing for phosphates and potash" and "implies higher earnings in the fourth quarter and very strong results continuing into 2022." CF Industries' CEO similarly celebrated, during a Q3 2021 earnings call, the "favorable supply-demand dynamics" for large fertilizer producers and a "very, very healthy dynamic that leads to a much longer period of positive fundamentals for our business" if it continued "into 2023 and

45

probably beyond." He also said that farmers facing rising input costs would not cut back on fertilizer: "if you're a farmer, you can look at different options. But that's not going to come at the expense of nitrogen and probably even at fertilizer. It's going to come at some other issues."

130. Taken together, these statements corroborate Defendants' collective ability-to-pay pricing strategy—one premised on the shared understanding that farmers have no viable alternative but to accept the prices Defendants set.

### f. The Financial Proof: Defendants' Own Financial Statements

131. The most compelling proof that cost factors cannot explain Class Period pricing is found in Defendants' own financial statements. In a competitive commodity market, producers facing rising input costs can, at best, pass those increases on to customers on a roughly one-to-one basis—allowing revenues to rise proportionally while margins remain stable. In fact, in most truly competitive environments, firms are often unable to fully pass through higher costs without risking the loss of customers to lower-priced competitors. As a result, producers typically must absorb part of the cost increase, which leads to compressed profit margins. Margin expansion—profits growing substantially faster than costs—is not a competitive outcome. It is the economic signature of pricing power exercised above competitive levels.

132. As Figure 12 demonstrates, Nutrien's, CF Industries', and Mosaic's margins expanded dramatically and simultaneously beginning in 2021.[5]

---

[5] As noted above, Koch and Yara do not make their financials public.



Fig. 12. Defendant Gross Margin: 2019–2025. Sources: CF Industries, Mosaic, and Nutrien 10-K filings with the SEC.

133.     Figure 12 makes the financial anatomy of the conspiracy unmistakable. In the pre-conspiracy baseline period (2019–2020), all three Defendants operated with gross margins typical of competitive commodity producers: CF Industries averaged approximately 22%, Nutrien averaged approximately 26%, and Mosaic averaged approximately 11%.[6]

134.     Then, beginning in 2021 and peaking in 2022, every Defendant's gross margin expanded dramatically and simultaneously. CF Industries' gross margin surged from 19% in 2020 to 37% in 2021 and then to 52% in 2022—a near-tripling from the pre-conspiracy baseline of 22%.

---

[6] Mosaic's lower gross margin relative to CF Industries and Nutrien reflects structural differences in product economics, not competitive performance. Nitrogen production (CF Industries' core business) synthesizes natural gas and air — inputs with relatively low variable costs — yielding inherently higher margins. Phosphate and potash production (Mosaic's core business) requires mining phosphate rock, purchasing sulfuric acid and ammonia as feedstocks, and incurring Saskatchewan mining costs — physical commodity inputs whose prices rise with broader market conditions, structurally compressing margins.

Nutrien's gross margin rose from 25% in 2020 to 34% in 2021 and 41% in 2022—a 64% expansion from its pre-conspiracy average. Mosaic's gross margin climbed from 12% in 2020 to 26% in 2021 and 30% in 2022—nearly tripling from its pre-conspiracy average of 11%. That all three Defendants—operating in different nutrient categories (nitrogen for CF Industries, phosphate and potash for Mosaic, and all three for Nutrien), with different feedstock inputs and different cost structures—expanded margins simultaneously and to similar degrees is powerful evidence of coordinated pricing rather than independent competitive responses to separate cost shocks.

135. The post-peak period (2023–2025) further corroborates the conspiracy. After 2022, gross margins moderated but did not return to pre-conspiracy baselines. By 2024, CF Industries' gross margin remained at approximately 35%—still 59% above its 2019–2020 average of 22%. Nutrien remained at approximately 29%—still 12% above its pre-conspiracy average of 26%. Mosaic stabilized at approximately 14%—modestly above its pre-conspiracy average of 11%. Then in 2025, margins resumed expanding across all three Defendants: CF Industries to approximately 38%, Nutrien to approximately 31%, and Mosaic to approximately 16%— consistent with the 2025 price resurgence and with Plaintiff's allegation that the conspiracy remains ongoing. The failure of margins to return to competitive levels—despite the near-complete normalization of natural gas costs and supply chain disruptions by 2023–2024—is economically inexplicable absent persistent structural pricing power maintained through the coordinated conduct alleged in this Complaint.

136. The synchronized expansion of margins across all three Defendants is the definitive financial signature of coordination. In a competitive market, margin expansion by one producer would attract supply expansion by competitors seeking to capture share, which would in turn compress margins back toward competitive levels. The discipline never materialized. All three

Defendants expanded margins simultaneously, sustained them through 2022, and then allowed them to contract only partially and gradually – moving in lockstep on the way up and on the way down. No Defendant was willing to cut price to capture share at historically profitable margins—precisely the behavior expected under a coordinated agreement.

137.    Another clear way to separate legitimate cost pass-through from supracompetitive pricing is to examine how quickly a company's costs rise compared to how quickly its profits rise. When a firm is merely covering higher input costs, profit growth should roughly mirror cost growth—a ratio close to 1:1. When profits grow far faster than costs, the firm is exercising pricing power that is inconsistent with competitive market behavior.

138.    In a competitive market, attempts to raise prices well beyond cost increases would be disciplined by rivals who would undercut inflated prices and capture market share. This dynamic keeps the profit-to-cost growth ratio anchored near parity. Ratios substantially above 1:1 signal a breakdown of competitive constraints. A ratio of 5:1 or 10:1 means the firm is capturing five or ten dollars of additional profit for every dollar of additional cost—an outcome possible only when competitors are not effectively challenging the firm's pricing.

139.    Figure 13 applies this diagnostic test by comparing year-over-year changes in cost of goods sold to changes in operating income for Defendants Nutrien, Mosaic, and CF Industries across two consecutive periods: 2020→2021 and 2021→2022. Operating income is used because it reflects core fertilizer profitability, excluding non-operating items such as interest expense, foreign currency effects, impairment charges, and taxes that vary for reasons unrelated to fertilizer pricing.



Fig. 13. The Cost-Price Disconnect: % Change in COGS vs. % Change in Operating Income, by Defendant (2020→2021 and 2021→2022). Sources: CF Industries, Mosaic, and Nutrien 10-K filings with the SEC.

140.    The results are striking. Compared to the pre-conspiracy year 2020, in the 2020→2021 period, the data reveals the most dramatic disconnect. Nutrien's costs rose 17% while its operating income surged 593%—a ratio of 35.3:1. This means Nutrien captured 35 dollars of additional operating profit for every one dollar of additional cost. Nutrien's own executives publicly described the company's strategy during this period as "price over supply"—a candid acknowledgment that Nutrien was prioritizing price maintenance over volume. Mosaic's costs rose 20% while its operating income surged 498%—a ratio of 24.6:1. Mosaic captured nearly twenty-five dollars of additional operating profit for every one dollar of additional cost, in phosphate and potash segments with entirely different feedstock inputs from Nutrien's nitrogen and potash

50

operations, yet the pattern of radical margin expansion was the same. CF Industries' costs rose 25% while its operating income rose 178%—a ratio of 7.1:1. CF Industries' cost increase was the largest of the three Defendants in percentage terms, yet even CF still grew operating profits at seven times the rate of its cost increases. Indeed, on August 5, 2024, when natural gas prices were at historic lows, CF Industries' CEO Anthony Will said, "Longer term, we expect the global energy cost structure to continue to provide significant margin opportunities for our North American production network."

141.    Building on already supracompetitive pricing levels, the pattern persisted in the 2021→2022 period. CF Industries: COGS +28%, operating income +212%, ratio 7.5:1. Nutrien: COGS +23%, operating income +142%, ratio 6.2:1. Mosaic: COGS +46%—the steepest cost increase of any Defendant in either period—operating income +94%, ratio 2.0:1. Even Mosaic, facing a 46% cost surge, still managed to grow operating profits at double the rate of its costs. The fact that all three Defendants maintained ratios well above the 1:1 competitive benchmark in 2021→2022—a period when Defendants publicly attributed the price increases to cost pressures from the Russia-Ukraine conflict—confirms that the price increases went far beyond what cost pass-through required.

142.    Across all six company-year observations, every ratio exceeded 2:1, and the average ratio was approximately 13.8:1. This means that, on average, Defendants' operating income grew nearly fourteen times faster than their costs throughout the 2021–2022 period. No plausible cost-based explanation—whether natural gas prices, supply chain disruptions, or geopolitical shocks—can account for operating profits rising fourteen times faster than costs across three different companies operating in three different nutrient categories with distinct production processes, feedstock inputs, and geographic exposures. If the price increases were independent

51

responses to separate cost shocks, the ratios would vary widely and some might approach 1:1. Instead, every ratio is extreme, and the pattern is uniform. These ratios constitute a clear financial signature of coordinated supracompetitive pricing.

### 2. Defendants Coordinated Supply Curtailments and Capacity Reductions

143. Defendants did far more than raise prices in parallel. Across the Class Period, each Defendant simultaneously engaged in a sustained pattern of supply restriction—curtailing production, idling plants, deliberately under-utilizing existing capacity, and refusal to restore idled facilities—even as fertilizer demand was strong and margins reached historic highs. Read together with Defendants' public statements, this conduct forms a coherent and mutually reinforcing strategy: suppress supply to sustain supracompetitive prices.

144. Defendants claim that the high fertilizer prices they charged are the result of input prices and international supply disruptions that are out of their control, but these were merely excuses or manufactured events to hide their coordination.

145. In a Q4 2021 earnings call, CF Industries' CEO expressed confidence that the extraordinary price environment would persist for years, dismissing any competitive threat that might compress North American producers' margins. He stated that he was "not afraid of this boogie man out there that's going to come and dump excess product into the global marketplace." He projected that North American producers would enjoy "three or four years of these huge margin opportunities."

146. Despite their explicit awareness of a multi-year window of historically unprecedented energy spreads, Defendants chose not to expand their production capacity to serve purchasers at competitive prices; instead directing record cash flows toward share buybacks and export-oriented joint ventures, while domestic supply remained constrained and prices remained

at inflated levels through 2025.  In a Q3 2024 earnings call, CF Industries confirmed that domestic "supply and inventories, whether that be with retailers or with producers, is limited" and "that sets up a positive environment" for North American producers.

147.    Defendants' thinly veiled supply restrictions did not go unnoticed.  On December 8, 2021, the Family Farm Alliance sent a letter to the United States Department of Justice, "calling for an investigation into the highly-consolidated fertilizer sector on the suspicion of anticompetitive practices." The letter called out Defendants' unsupported claims of supply issues:

> Claiming a global shortage, fertilizer companies have recently broken records with the ballooning prices they charge for fertilizer. Yet the companies' own documents refute any shortage claims and reveal they have additional capacity they're not utilizing. While it's true that natural gas prices are currently high, Yara's 2021 third quarter report states explicitly that this has had "[l]imited impact on finished fertilizer production to date; Yara is closely monitoring the situation going forward." Nutrien's annual report states that "due to historically low global ammonia prices we curtailed production...while maintaining flexibility to respond to improvements in the market condition." Their potash capacity likewise exceeds current production levels, and in 2020 the cash cost to produce potash was $59 per tonne, the lowest level on record for Nutrien.

148.    In a competitive market, Defendants' extraordinary 2021-2022 margins would have triggered aggressive output expansion and investment. Instead, every Defendant moved in the opposite direction. Each reduced production, deferred investment, or operated below capacity, and each did so during the same period and under the same market conditions, with the same result. This uniformity is economically irrational as independent behavior and is consistent only with a coordinated understanding that no producer would relieve the supply tightness on which the conspiracy depended.

149.    According to the Agricultural Retailers Association, American Soybean Association, and the National Association of Wheat Growers, not only did Defendants restrict production, but they also kept prices from equalizing through imports by effectively shutting out

the largest foreign exporters from the most concentrated parts of the domestic industry. They claim that Defendants, like CF Industries and Mosaic, gained significant domestic market share in 2020 by unloading large volumes of fertilizer at low prices.  This put Defendants in a position to control the price of fertilizer in the United States during the Class Period through their coordinated production restraint.

150.   Defendants' supply reduction efforts included, but were not limited to, the following actions:[7]

a.   Nutrien's Q1 2021 Earnings Call disclosed that the company's stated strategy was explicitly "price over supply"—a public declaration that Nutrien would manage production to maximize price rather than to serve farmer demand.

b.   Mosaic's refusal on a Q1 2021 earnings call to restart or bring back idled potash production capacity at its Colonsay facility despite admitting demand for potash was strong because "it will also require a sustained price, probably a little higher than what it is even today."

c.   Nutrien's disclosure in a Q2 2021 call that it (1) was "sold out for a period of time" in potash while "continuing to look at these strong prices," and (2) projected that new supply would remain "relatively limited for the next couple of years."

d.   CF Industries' September 2021 shutdown of its two UK nitrogen and ammonia production facilities, which the UK's National Farmers Union President stated was "likely to further restrict global

---

[7] Defendant Koch is not a public company, but upon information and belief, Koch acted similarly and either failed to expand capacity in response to accelerating and record profits and increased demand.

supply."

e.  Yara's Q4 2021 earnings disclosure that it had reduced its European ammonia production to approximately 65% of capacity and would "continue to optimize its operating rates" in 2022—language that, like Nutrien's "price over supply" declaration, signals deliberate market management. Yara's CEO Svein Tore Holsether publicly described Yara's operating rate reductions as "a responsible response to current market conditions".

f.  CF Industries' June 2022 closure of its Ince facility in the United Kingdom.

g.  CF Industries' admission on a Q2 2022 earnings call that the domestic UAN fill program was deliberately limited and that the reason was a strategic choice to prioritize exports.

h.  Nutrien's statement on its Q2 2022 earnings call that it has been exporting more UAN from the United States than it has previously, and it is looking at opportunities to export more ammonia.

i.  Yara's June 2022 closure of its nitrogen ammonia plant at Belle Plaine, Saskatchewan—one of Yara's principal North American nitrogen production facilities—went "for a turnaround," which occurred during the summer fill pricing window when growers were seeking fertilizer inventory. Yara operated at 57 percent of its production capacity in 3Q 2022, down from its more typical rate of 80 to 90 percent. The curtailments took 1.7 million tonnes of Yara's

55

ammonia and 900,000 tonnes of its finished fertilizer production capacity off the market.

j.   Mosaic's December 2022 announcement of a production curtailment at Colonsay, after claiming it was "ramping up to a targeted 1.8mn–2mn t/year by late 2023."

k.   Mosaic's 2023 admission that its "ability to produce processed phosphates has been less than our annual operational capacity."

l.   Yara International's CEO's February 2023 statement that Yara opted for "proactive curtailment to optimally manage market conditions" in 2022, and confirmation that Yara cut ammonia output by 1.7 million MT – 35% of European capacity.

m.   Yara's May 2023 shutdown of the Ferrara, Italy plant just three weeks after bringing it back online.  All told in 2023, Yara had reduced its European ammonia production by nearly 20%.

n.   Nutrien's August 2023 announcement that it would "indefinitely pause its ramp-up plans for potash production and halt work on its clean ammonia project at Geismar, Louisiana."

o.   CF Industries' 2023 cessation of operations of the Billingham ammonia facility—the largest ammonia complex in the UK. The permanent closure eliminated approximately 590,000 short tons of annual ammonia capacity, a substantial portion of which had previously been exported to supply the United States market.

p.   Nutrien's acknowledgement in its 2024 Annual Information Form

that its potash nameplate capacity represented 53% of total North American nameplate capacity and that its production represented 57% of North American production.

151.    Defendants not only pulled back production of fertilizers at their facilities, but they also failed to take meaningful steps to expand capacity or arrested ongoing attempts to expand, notwithstanding strong demand and record profits. Publicly available information fails to show concerted efforts on Defendants' part to expand production at existing facilities or concerted efforts to open new facilities.

### E.    Government Investigations

152.    Defendants' anticompetitive conduct has attracted significant federal government attention.

153.    In September 2025, the Department of Justice and the USDA signed a Memorandum of Understanding formalizing cooperation on competition issues across agricultural input markets, including fertilizers. This inter-agency coordination reflects the federal government's growing concern about structural competition failures in the fertilizer industry.

154.    In 2025, the DOJ launched a formal investigation into fertilizer industry pricing and supply practices. The FBI has also been engaged in this investigation. Defendants are subjects of this federal investigation.

155.    In December 2025, President Trump signed an executive order directing the Department of Justice and the Federal Trade Commission to each establish a "Food Supply Chain Security Task Force" with authority to aggressively investigate price fixing and anticompetitive practices across the food sector, explicitly including fertilizer manufacturers.

156.    Congressional concern has mirrored executive branch action. Senator Chuck

57

Grassley, R-Iowa, reintroduced the Fertilizer Research Act—a bipartisan measure requiring USDA to study pricing and competition across the fertilizer market. The Senate Judiciary Committee held a hearing entitled "Pressure Cooker: Competition Issues in the Seed and Fertilizer Industries," at which farmers testified about the devastating effects of fertilizer pricing and market concentration. Senators from both parties expressed concern and signaled legislative action. United States Secretary of Agriculture Brooke Rollins confirmed that the USDA study would proceed in coordination with the DOJ investigation, "to take a look at whether farmers truly have fair choices when buying the inputs that feed the nation."

157. On October 28, 2025, the President of the Iowa Corn Growers Association ("ICGA"), Mark Mueller, addressed the United States Senate Committee Hearing on Competition Issues in the Seed & Fertilizer Industries, and reported that "the massive increase in the cost of fertilizer is crushing corn growers in Iowa, and they aren't alone. Growers across the country are facing an impossible decision: buy fertilizer or stay solvent." Mueller attributed high fertilizer prices to two decades of unchecked consolidation in the United States fertilizer industry, with only a few major companies controlling each market segment.

158. In January 2026, USDA Deputy Secretary Stephen Vaden publicly stated that Nutrien and Mosaic have been "colluding" to limit United States fertilizer supply and control prices, describing their combined market position as a "duopoly" that "constrained fertilizer supply in this country" and "drove up the cost that farmers are paying." Deputy Secretary Vaden further stated that the administration would not allow these companies to undermine new market entrants or continue their anticompetitive conduct. Vaden doubled down in March 2026, when he reiterated that Nutrien and Mosaic were engaging in "duopoly" behavior.

159. In February 2026, both the ICGA and the Texas Corn Producers Association sent

58

separate letters to United States Attorney General Pam Bondi seeking information about what the United States Department of Justice is doing to pursue possible antitrust actions against the fertilizer industry. As reported by Progressive Farmer, the letters reflect farms' growing frustrations over lower crop returns while fertilizer prices continue to remain high.

160.    On March 4, 2026 news outlets reported that the DOJ Antitrust Division's Chicago Office had launched a formal investigation into whether major fertilizer producers colluded or coordinated to raise prices charged to United States farmers. The investigation reportedly targets the Defendants in this action: Nutrien, CF Industries, Mosaic, Koch, and Yara.

161.    On March 12, 2026, United States Senator Josh Hawley sent letters to the CEOs of CF Industries, Mosaic, Koch, Nutrien, and Yara. Senator Hawley wrote, "There have, of course, been recent disruptions to the global fertilizer market due to the Iranian conflict overseas, including bottlenecks in the Strait of Hormuz. But the price run-ups American farmers are facing far outpace any disruption from recent events. To be more specific, the percentage of United States fertilizer supply affected by issues in the Hormuz Strait appears to be minimal compared to the sudden change in prices."

162.    "American farmers cannot absorb another price shock. The current record retail nitrogen pricing, for example, could cripple American corn production. And farmers have already endured historic run-ups in fertilizer prices in 2021 and 2022," explained Hawley.

163.    Senator Hawley continued, "These latest price hikes are especially troubling because the fertilizer industry is highly concentrated. Public reporting indicates that a small group of firms dominates the domestic market for nitrogen, phosphate, and potash. There are now also public reports that the Department of Justice has been investigating whether leading fertilizer producers coordinated to raise prices."

59

164. Senator Hawley concluded, "American farmers should not be forced to bankroll opportunistic pricing under cover of an overseas crisis. If your company is using this conflict as a pretext to raise prices beyond what market conditions justify, Congress will not ignore it."

165. Senator Hawley sent an additional letter to Attorney General Bondi urging the Department of Justice to formally investigate recent increases in fertilizer prices, following reports of recent Departmental action. He noted in the letter that "the United States Department of Agriculture found that in 2021 fertilizer prices paid by United States farmers increased more than 60 percent overall, including a 95 percent increase in nitrogen fertilizer prices and more than a 70 percent increase in potash prices."

166. "American farmers should not be exploited by dominant firms using a foreign crisis as cover to impose unjustified price increases, restrict supply, or coordinate market behavior. If firms are using this moment to pad margins at the expense of producers who feed this country, the Department should act swiftly," Senator Hawley concluded in the letter.

167. On March 20, 2026, the Fertilizer Transparency Act of 2026 was introduced by a bipartisan group of senators. The bill would mandate weekly public reporting of fertilizer prices, production volumes, and sales volumes. The bill was introduced because "rising fertilizer costs and low commodity prices are continuing to erode farmers' profitability."

168. These government findings and investigations are consistent with and corroborate the private antitrust claims alleged herein. The USDA's public characterization of Defendants' conduct as collusion, offered by a senior official of the Executive Branch with access to significant market data and regulatory information, provides powerful confirmation that the conduct alleged in this Complaint reflects actual market reality.

F.    **Plus Factors Supporting the Inference of Unlawful Conspiracy**

60

169. Under controlling antitrust law, a plaintiff may establish a Section 1 conspiracy through circumstantial evidence of conscious parallelism augmented by "plus factors"—additional facts that, taken together, render an inference of coordinated conduct more plausible than independent action. "Plus factors are economic actions and outcomes, above and beyond parallel conduct by oligopolistic firms, that are largely inconsistent with unilateral conduct but largely consistent with explicitly coordinated action."

170. Recognized plus factors include: market concentration that makes coordination feasible; conduct against individual self-interest that only makes sense as part of a coordinated scheme; opportunities for collusion through trade associations and industry meetings; high barriers to entry that protect coordination from competitive erosion; inelastic demand that enables sustained supracompetitive pricing; product interchangeability that facilitates uniform pricing; and prior antitrust violations reflecting an established culture of anticompetitive conduct. All seven plus factors are present here and are detailed below.

### 1. Extreme Market Concentration

171. Market concentration is a plus factor in analyzing the plausibility of an antitrust conspiracy. The United States fertilizer market is among the most concentrated industries in the American economy, providing the structural precondition necessary for coordinated pricing to be both feasible and effective.

172. A 2024 Texas A&M University study titled "Concentration and Competition in the United States Fertilizer Industry" noted that the Herfindahl-Hirschman Index (HHI) measure for Potash in the United States was at 3,455, Nitrogen Fertilizer was at 2,382, and Phosphate Fertilizer was at 4,553. DOJ and FTC consider markets in which the HHI is in excess of 1,800 points to be highly concentrated.

173. Farmers have recognized that consolidation has led to higher prices. For instance, a farmer in North Dakota recently noted that "[f]ertilizer's up over a year ago, but I think a big part of that is driven by too few players . . . . when you have monopolies control fertilizer, that's what happens."

174. In comments submitted to the USDA, United States farmers described an asymmetric fertilizer industry power dynamic, for instance, they were held "hostage while we have no other options" and "at the mercy of the large conglomerates" that could cause "artificial product shortages" due to their "ownership of fertilizer resources."

175. This power dynamic is due to a highly concentrated market. For nitrogen fertilizer, CF Industries, Nutrien, Koch, and Yara-USA account for approximately 82% market share, which is down from "46 firms making Nitrogen" in 1984. For potash and phosphate, the United States has only 2 major Potash suppliers: Nutrien & Mosaic. Moreover, the two firms likely also control a high market share of imports, with 93-96% of United States potash imported and 83% of potash production comes from Canada's export cartel Canpotex, consisting of Nutrien and Mosaic. Phosphate producers decreased in number from 11 phosphoric acid producers with 12 million metric tons of capacity to four United States phosphate producers with 7.5 million metric tons of capacity in 2021, with Mosaic controlling 60% of capacity.

### 2. Conduct Against Individual Self-Interest

176. A hallmark plus factor supporting an inference of conspiracy is conduct that would be economically irrational for any single firm acting unilaterally but becomes rational as part of a coordinated scheme. The economics are straightforward: a firm with significant idle capacity that faces strong demand and record high prices has every individual incentive to maximize output—to capture as much of the profit opportunity as possible before market conditions change. The

consistent, industry-wide failure to do so during the Class Period is one of the most powerful plus factors in this record.

177.    Consider Nutrien's conduct: the world's largest potash producer, with six Saskatchewan mines and over 20 million tonnes of capacity, publicly declared its strategy as "price over supply" in Q1 2021. At that moment, potash prices were rising sharply, farmer demand was strong, and Nutrien was "sold out"—meaning customers could not obtain the potash they needed. A competitive firm sold out at record prices would immediately announce and execute capacity expansion to capture market share. Instead, Nutrien publicly committed to "relatively limited new supply in the next couple of years," returned $9 billion to shareholders since 2018, and allocated only $1 billion to capital expenditures in 2022. This posture is economically rational only if Nutrien was confident—based on a coordinated understanding with Mosaic and other competitors—that competitors would also refrain from supply expansion. A unilateral supply restraint by Nutrien, absent confidence in coordinated competitor behavior, would simply cede market share to Mosaic, CF Industries, and Koch.

178.    Mosaic's conduct is similarly contrary to unilateral self-interest. At the outset of the Class Period in Q1 2021, Mosaic's CEO publicly acknowledged that "demand for potash has been strong" — yet simultaneously refused to restart idled production capacity at its Colonsay potash mine, conditioning any restart on "a sustained price, probably a little higher than what it is even today." A firm acting unilaterally in its own interest, facing strong demand and rising prices, would immediately restore idled capacity to capture the profit opportunity. Mosaic did the opposite: it withheld supply while prices rose, then in December 2022 — after publicly claiming it was "ramping up" Colonsay "to a targeted 1.8 to 2 million tonnes per year by late 2023"— abruptly curtailed production at that same facility. By 2023, Mosaic admitted that its "ability to

produce processed phosphates has been less than our annual operational capacity," while simultaneously reducing capital expenditures by $200 million for 2024 and returning nearly $900 million to shareholders year-to-date. Mosaic's CEO confirmed the governing strategy explicitly as late as Q3 2024, stating that "until we see something change on the supply side fundamentally, that is going to stay" and expressing no concern about "an obvious catalyst for something to change on the pricing side." That is not the language of a firm competing for market share — it is the language of a firm confident that supply discipline will hold. This conduct — withholding capacity during strong demand, curtailing announced ramp-ups, cutting capital investment while returning cash to shareholders at record margins, and publicly projecting that prices will remain elevated because no new supply is coming — is economically irrational for a firm acting unilaterally, but entirely rational for a firm operating under a coordinated understanding with Nutrien that neither producer would relieve the supply tightness on which the conspiracy's pricing power depended.

179.    CF Industries' conduct reflects the same pattern. Despite achieving record EBITDA of $5.88 billion in 2022 and publicly acknowledging "all-time record" global nitrogen demand, CF Industries announced no new United States greenfield nitrogen production capacity during the Class Period. Instead, it: permanently closed its Billingham, UK ammonia plant; and directed $5 billion to shareholder returns rather than supply investment. A competitive firm earning record margins in a market with acknowledged strong demand would invest aggressively in capacity expansion to secure long-term market position. CF Industries did not do so—behavior that is irrational unilaterally but rational as part of a coordinated strategy to avoid the supply growth that would erode pricing power.

### 3. Opportunities for Collusion Through Joint Ventures, Trade Associations, Industry Meetings

180.    Defendants had abundant and repeated opportunities to communicate and

64

coordinate through their shared membership in multiple joint ventures, trade associations, industry conferences, joint investor presentations, and shared market data and pricing intelligence platforms. Shared competitor forums are a recognized plus factor because they provide the structural opportunity for coordination—the means by which a common understanding could have been reached and maintained across the five-year Class Period. The record here goes far beyond shared membership. During the height of the alleged conspiracy, Defendants' own CEOs simultaneously held positions of formal leadership authority in the same trade association, providing a direct institutional channel for senior executive interaction at the very highest level of each competing firm during the years of the alleged conspiracy.

### a. Canpotex

181.    Canpotex is a Canadian potash export and marketing company jointly owned by Defendants Nutrien and Mosaic. Canpotex coordinates the offshore marketing, sales, and transportation of potash produced by Nutrien and Mosaic.

182.    Canpotex was formed in 1972 as a joint export association for Canadian potash producers. Through Canpotex, its owners collectively market and distribute potash produced from their Canadian mines to customers outside of North America. Canpotex's five largest markets (Brazil, China, India, Indonesia, and Malaysia) account for approximately 75% of Canpotex's annual potash exports.

183.    Canpotex operates an integrated export system that includes a fleet of specialized railcars, port terminal facilities, and dedicated ocean vessels used to transport potash overseas. This infrastructure allows Canpotex's members to export potash from Saskatchewan mines to overseas customers through a centralized transportation network.

184.    In August 2022, Nutrien announced that Ken Seitz was appointed President and

65

CEO by its Board of Directors. Notably, Seitz was the former President and CEO of Canpotex.

185. By selling potash through a single export marketing organization, Canpotex provides its owners with a mechanism for coordinating key aspects of potash sales, including export volumes and shipping schedules. Canpotex collects and manages competitively sensitive information concerning potash production, inventories, customer demand, pricing conditions, and shipment logistics.

186. The Canpotex joint venture's supply management conduct during the Class Period further confirms its role as a coordinating mechanism for Nutrien and Mosaic. In July 2024, Canpotex publicly announced that all potash volumes available for offshore sale through September 30, 2024, were fully contracted, citing "strong demand and engagement in all major offshore markets." In March 2025, Canpotex again confirmed it was fully committed on its offshore sales volumes for the entire first half of 2025.

187. These public announcements—made simultaneously with periods of elevated domestic United States potash prices — are consistent with Nutrien and Mosaic using Canpotex to manage the timing and volume of global potash supply in a manner that supports domestic price levels. By committing offshore volumes forward and publicly signaling supply constraints in international markets, Canpotex provides Nutrien and Mosaic with a joint mechanism to manage global potash availability in ways that reinforce the domestic supply discipline documented herein.

188. While Canpotex is not used to export potash into the United States, it creates opportunities for would-be competitors, Defendants Nutrien and Mosaic, to exchange competitively sensitive information and align their pricing and supply strategies in the United States.

189. In a Q1 2022 earnings call, Nutrien said: "With respect to our margins compared to

what Mosaic might have said on their call... I think it's fair to say that out of Canpotex, you can expect something similar. And then in North America, we would go our own way. And so I wouldn't talk about that because that's confidential. But yes, I think generally… you can say that it would be similar." In a genuinely competitive market, a producer would have no basis to predict that a rival's margins would be "similar" to its own, nor any reason to treat that similarity as a subject requiring confidentiality, unless the two companies had reached a common understanding about the prices they intended to charge and the supply volumes they intended to withhold from the North American market.

190.    On January 21, 2026, United States Department of Agriculture Deputy Secretary, Stephen Vaden, held a videotaped conversation with the National Agricultural Law Center, in which he attributed high fertilizer prices to anticompetitive conduct, such as the Canpotex operation, telling the audience that:

> Mosaic and Nutrien[] have a joint venture in Canada where they openly, their word[,] work together, my word, collude to control prices up there. That would be such a clear violation of the antitrust laws of the United States. They don't bring that joint venture officially down here in the United States, but what they've been able to manage to do through other means is achieving the same result, constraining supply and driving up the price that farmers pay. It's unacceptable.

### b. Point Lisas Nitrogen Limited

191.    Defendants CF Industries Holdings, Inc. and Koch Fertilizer LLC jointly own and operate Point Lisas Nitrogen Limited ("PLNL"), a large-scale ammonia production facility located in Trinidad and Tobago. PLNL is a 50/50 joint venture that produces hundreds of thousands of tons of anhydrous ammonia annually—an essential upstream input for nitrogen fertilizers, including urea and UAN, that are sold into the United States. Because ammonia is the foundational feedstock for downstream nitrogen products, control over ammonia production and allocation directly affects supply conditions, costs, and pricing in United States nitrogen fertilizer markets.

67

192. Through their joint ownership and operation of PLNL, CF and Koch necessarily engage in ongoing coordination regarding production levels, plant operations, maintenance schedules, capital expenditures, and the disposition of output. Those joint activities provide recurring opportunities to exchange competitively sensitive information, including present and anticipated production volumes, inventory positions, shipping plans, and demand expectations. In a market characterized by relatively few large producers, such exchanges reduce uncertainty regarding rivals' behavior and facilitate alignment on output and pricing decisions in the United States.

193. PLNL's ammonia output is export-oriented and can be directed into global markets, but it is shipped primarily to the United States, with regular deliveries to ports in Florida, California, Texas, and Louisiana. Output can also be withheld based on the joint venture's operational decisions. By coordinating capacity utilization, turnaround timing, and output allocation at PLNL, CF and Koch can influence the volume of ammonia—and, by extension, downstream nitrogen products—available to the United States market. Coordinated reductions or delays in PLNL output, or aligned decisions regarding the timing and destination of shipments, can tighten supply conditions and support higher prices for ammonia, urea, and UAN sold domestically.

194. PLNL functions as a structural conduit that brings two otherwise competing nitrogen producers into repeated, high-level contact concerning a critical upstream input. The joint venture's governance and operational processes require regular interaction and consensus on decisions that bear directly on supply. In concentrated commodity markets, such a shared production platform lowers the costs of coordination, increases transparency into each other's operations, and makes it easier to reach and maintain a common understanding regarding output

68

discipline. Consistent with these economic incentives, Defendants used PLNL as a mechanism to align production and supply decisions that had foreseeable and intended effects on prices in United States nitrogen fertilizer markets.

### c. The Fertilizer Institute (TFI): Board Leadership, Annual Meeting, and Industry Conferences

195.    The Fertilizer Institute ("TFI"), founded in 1969 and headquartered in Arlington, Virginia, is the primary domestic trade association and federal lobbying organization for the United States fertilizer industry. TFI describes its mission as representing fertilizer producers, wholesalers, retailers, and trading firms before Congress and federal regulatory agencies, and its services to members expressly include "market intelligence data collection and aggregation" as a stated membership benefit. All five Defendants are active TFI members, as explained below.

196.    TFI Board Leadership. In February 2019, Tony Will, President and CEO of CF Industries, was elected Chairman of the TFI Board of Directors, a position he held through the 2021 board election. As TFI Chairman, Will was one of the two most senior officers of TFI's governing board and presided over TFI's board meetings, which were attended by competing fertilizer producers including other Defendants. In 2021—at the peak of the price coordination period—TFI held its Annual Meeting in Dallas, Texas, at which CF Industries' CEO Tony Will was reconfirmed as TFI Chairman and Koch Fertilizer's Scott McGinn was elected Vice Chairman. The April 30, 2021 board election occurred while fertilizer prices were in the middle of their most rapid escalation—the same Q1 2021 period in which Nutrien publicly declared "price over supply" and Mosaic and CF Industries announced parallel supply discipline. During this period, the following Defendants' senior representatives were simultaneously elected as TFI board directors: Tony Will (CF Industries, Inc.), Scott McGinn (Koch Fertilizer, LLC), Michael Webb (Nutrien), Joc O'Rourke (The Mosaic Company), and Geraldo Mattioli (Yara). Thus, all five of

Defendants' senior officers sat together on TFI's Board of Directors during the height of the alleged conspiracy;

197.    <u>TFI Annual Business Conference</u>. TFI's Annual Business Conference is, by TFI's own characterization, "the premier networking event for the fertilizer industry" and features "three days of meetings, networking and productive business." TFI makes available to member companies private meeting suites and rooms for bilateral meetings during the conference. Discovery will establish the full schedule of meetings attended by Defendants' senior leadership; based on publicly available records, each of these conferences was attended by senior representatives of at least three of the five Defendants.

198.    <u>TFI World Fertilizer Conference</u>. In addition to the Annual Business Conference, TFI holds an annual World Fertilizer Conference each fall, described as "fall's most important business and networking event for the global fertilizer industry" which draws "hundreds of TFI members, industry professionals, and representatives from around the world." Recent conference locations include Dallas, Texas, and Chicago, Illinois. The World Fertilizer Conference is attended by commercial, market intelligence, and senior management staff from fertilizer industries, including Defendants.

199.    <u>TFI Market Intelligence Data Collection</u>. TFI provides members with a proprietary market intelligence function that expressly includes "market intelligence data collection and aggregation" as a membership service. TFI publishes "The Fertilizer RECORD," a market data report (monthly data released quarterly) that collects and aggregates individual member data on fertilizer production, producer inventories, and "producer disappearance" (sales volumes)—then provides that aggregated information back to member companies. TFI also publishes a Fertilizer Capacity Report that discloses "fertilizer production capacity by company by location in Canada

70

and the United States" across all three macronutrients, including the capacity of each of the five Defendants. TFI member companies, including Defendants, provide their own capacity and production data to TFI for inclusion in these reports, which are then made available to all member-competitors. This mechanism—whereby Defendants disclose their production capacity and output data to a shared trade association that aggregates and redistributes it to all members—constitutes an institutionalized information exchange in which Defendants' competitively sensitive capacity and production data flows to their direct competitors through TFI as an intermediary.

### d. The International Fertilizer Association (IFA): Executive Committee and Annual Conference

200. IFA is the sole global fertilizer trade association, founded in 1927 and headquartered in Paris, France, with around 500 members from approximately 80 countries. IFA's Board of Directors includes permanent seats allocated to major member organizations—specifically including Nutrien and CF Industries, which hold permanent board seats—alongside rotating seats held by other producers.

201. IFA's Executive Committee is a senior governance body within IFA, responsible for financial oversight and operational coordination of the association. During the Class Period, CF Industries' CEO Tony Will served as IFA Chair for a two-year term. Upon Will's completion of that term in May 2025, Nutrien's CEO Kenneth Seitz was elected IFA Chair, with Will remaining on the Executive Committee as Immediate Past Chair. At the time of the 2025 transition—and for the period preceding it when the succession was arranged—Seitz (Nutrien) and Will (CF Industries), the CEOs of two of the three largest nitrogen fertilizer producers in North America, served simultaneously on IFA's Executive Committee as Chair-elect/Chair and Chair/Immediate Past Chair respectively. In addition, the following Defendants' senior representatives are currently serving on the board of IFA: Chris Bohn (CF Industries, Inc.),

71

Kenneth Seitz (Nutrien), Bruce Bodine (The Mosaic Company), and Svein Tore Holsether (Yara).

202.    IFA holds an Annual General Meeting and Conference each spring, which serves as the primary global gathering for fertilizer industry executives.  Specific IFA Annual Conference locations during the Class Period include: Vienna in May 2022; Czech Republic in May 2023; Singapore in May 2024; and Monaco in May 2025.  Defendants' senior representatives attended these conferences, where they presented, voted on governance matters, and interacted with each other in formal and informal settings.

203.    Notably, IFA participants discussed pricing and held closed doors meetings at the IFA annual conference. For example, at the 2022 Vienna IFA Annual Conference:

- • "Sources said the most likely price for the next [urea] tender, based on rumors and talk during the IFA conference in Vienna, would be around $640/mt CFR."

- • "Sources said they were surprised to hear a more bullish attitude [for quoted prices] during the IFA meeting in Vienna."

- • "Jordan Phosphate Mines Co. (JPMC) and Indonesia's Minister of Agriculture, Syahrul Yasin Limpo, have held talks about the further potential of Jordan supplying Indonesia with phosphate rock and fertilizers... The two parties held the talks at a May 30 meeting on the sidelines of the International Fertilizer Association's annual conference in Vienna."

204.    IFA IFASTAT and Market Intelligence: IFA operates IFASTAT, a proprietary statistical database compiled by IFA's Market Intelligence team providing 15 years of global production, trade, and supply data, consumption data, and detailed market outlook reports. IFA member companies—including Defendants, which hold board seats—receive detailed statistical

72

reports not available to non-members.  IFA also holds separate thematic committee meetings, including a Sustainability Committee attended by market analysts and commercial staff from member companies. These committee meetings, conducted between the annual conferences, provide additional forums for exchange of market intelligence among competing producers.

### e. The Fertilizer Industry Round Table (FIRT) and Other Shared Forums

205.    The Fertilizer Industry Round Table ("FIRT"), now operated in partnership with TFI, holds an annual Fertilizer Outlook and Technology Conference and publishes proceedings designed to "review best practices and processes across a wide range of fertilizer, agricultural, and environmental topics." FIRT's technical and operational staff-level participation supplements the CEO-level interactions at TFI and IFA, creating a multi-layer network of competitor interactions spanning from the highest executive level (TFI chairman, IFA chair) to technical and commercial staff (FIRT, TFI Market Intelligence committee). FIRT's annual Fertilizer Outlook and Technology Conference—recently held in Savannah, Georgia—provides a further forum for Defendants' technical personnel to interact, share operational information, and discuss supply, demand, and production trends.

206.    The BMO Capital Markets Farm to Market Conference: The BMO Capital Markets Farm to Market Conference is an annual two-day event held each spring in New York City, described as featuring "candid and informative discussions and panels with leaders from more than 100 companies in the sector." BMO confirmed that Nutrien, Mosaic, CF Industries, and Yara International are all regular participants presenting at this conference, with Nutrien's CEO Ken Seitz specifically confirmed as a speaker at the 2024 edition. CF Industries is also a confirmed participant at the 2025 conference. The 2022 conference—held at the height of the Class Period price surge—featured Nutrien's Interim President and CEO Ken Seitz as a speaker. The BMO

73

Farm to Market Conference has been held annually for at least 20 years, creates direct interaction opportunities between the CFOs and CEOs of competing fertilizer producers in an intimate setting with approximately 300 investors—a setting in which competitive market intelligence, pricing strategy, and supply outlook are the primary topics of management presentations.

### f. Other Trade Organizations

207.    Fertilizer Canada ("FC"): All Defendants are members of FC, a Canadian fertilizer industry organization headquartered in Ottawa, Ontario. CF Industries, Inc., Koch Fertilizer Canada, Mosaic, Nutrien, and Yara North America, Inc. are members of the Board of FC. FC is an organization representing producers, manufacturers, wholesale and retail distributors of nitrogen, phosphate, potash and sulfur fertilizers.

208.    The Sulfur Institute ("TSI"): Nutrien Ltd., Mosaic, and Koch Sulfur Products Company L.L.C., are all members and Board members of TSI, a global association for sulfur and sulfuric acid professionals, based in Washington, D.C. TSI sponsors a number of in-person trade events each year, such as the Sulphur World Symposium and its annual Executive Committee Meeting. Sulfur is used to process phosphate rock into phosphate fertilizers.

209.    Agricultural Retail Association ("ARA"): Both Koch Agronomic Services, LLC and The Mosaic Company are members of the ARA, an industry trade group based in Arlington, Virginia. Additionally, Nathan Packer (Nutrien Ag Solutions) and Bob Ness (The Mosaic Company), are members of the Board of ARA. ARA hosts a number of recurring in-person events, including the Annual ARA Conference and Expo, in addition to semi-annual in-person meetings of ARA committees.

### 4. High Barriers to Entry

210.    The existence of high barriers to entry is one factor that makes a market susceptible

to collusion. A collusive arrangement that raised produced prices above competitive levels would, under basic economic principles, attract new entrants seeking to benefit from the supracompetitive pricing. However, where significant barriers to entry exist, new entrants are less likely. Thus, barriers to entry help facilitate the formation and maintenance of a cartel.

211. The fertilizer industry is characterized by exceptionally high barriers to entry that protect Defendants' coordinated pricing scheme from competitive erosion by new market participants. High barriers to entry are a recognized structural plus factor because they indicate that supracompetitive prices can be maintained for extended periods without triggering entry by new competitors that would restore competitive prices. See Areeda & Hovenkamp, Antitrust Law ¶ 1434 (2023). The barriers in this industry are among the most restrictive in the United States economy.

212. Capital requirements: A new grassroots nitrogen fertilizer plant in the United States requires capital investment of approximately $1.5 billion to $3 billion or more, depending on capacity. A new phosphate rock mine and processing facility requires comparable investment. A new potash mine—which involves sinking mine shafts hundreds of meters into the earth, constructing underground infrastructure, and building surface processing facilities—requires capital investment of $4 billion to $10 billion or more, with development timelines of 10 to 15 years from project inception to first production. BHP Billiton's Jansen potash project in Saskatchewan, for example, announced in 2013, has required over $5 billion in capital and is not expected to reach commercial production until 2026 or later. These investment magnitudes place new entry beyond the realistic capacity of any firm not already operating in the industry at scale.

213. Natural resource constraints: Phosphate and potash fertilizers can only be produced where geological deposits of the relevant minerals exist. United States phosphate rock deposits are

concentrated in Florida and North Carolina, where Mosaic already controls the dominant mining operations. North American potash deposits are overwhelmingly in Saskatchewan, Canada, where Nutrien controls the dominant mine network. There are no significant untapped phosphate or potash deposits in the continental United States accessible to new entrants at competitive cost. A new entrant seeking to compete with Mosaic in phosphate or Nutrien in potash would need to either develop low-grade domestic deposits at uncompetitive cost or rely on foreign supply—which Defendants have actively worked to exclude through tariff petitions.

214.    Regulatory and permitting barriers: New mine development requires environmental impact assessments, mine permits, water rights, zoning approvals, and other regulatory authorizations that can take years to obtain and are subject to challenge and delay. Nutrien's Geismar clean ammonia project—announced years ago by a company with existing operational infrastructure, established supplier and customer relationships, and access to capital—remained "on indefinite pause" as of 2024. If the existing dominant producer cannot efficiently permit and construct new capacity, the barriers to entry for a new competitor are vastly higher.

215.    Distribution infrastructure: Fertilizer distribution requires access to specialized terminal infrastructure, barge networks, rail loading facilities, and deep-water port capacity. Nutrien's ownership of the largest agricultural retail network in North America (Nutrien Ag Solutions, with 2,000+ locations) gives it a distribution advantage that a new entrant could not replicate without decades of investment. The combination of production barriers, resource barriers, regulatory barriers, and distribution barriers makes the prospect of new entry constraining Defendants' pricing power within any realistic time horizon essentially nil.

216.    In comments submitted to the USDA, farmers described how incumbents made it impossible, especially for competitors with new technologies, to break into the industry. One

commenter described how fertilizer manufacturers may exercise market power to "set prices below production costs in order to drive out the new competition [green ammonia competitor]." Another commenter suggested that fertilizer companies with market power may also stifle new technology research.

### 5. Inelastic Demand

217.    Fertilizer demand is highly price-inelastic—meaning that farmers cannot meaningfully reduce their fertilizer purchases in response to price increases without suffering severe yield losses and economic harm. Inelastic demand is a recognized plus factor because it is one of the key conditions that enables and sustains a price-fixing conspiracy: it ensures that supracompetitive prices do not trigger demand destruction that would undermine the conspiracy's profitability.

218.    Nitrogen, phosphorus, and potassium are essential, irreplaceable nutrients that crops require for growth. There are no commercially viable substitutes for commercial farming operations. Organic alternatives—manure, compost, cover crops—can supplement but cannot replace synthetic fertilizers for the majority of United States commercial crop acres. This is particularly true for corn production, which requires 140–160 pounds of nitrogen per acre applied seasonally. Farmers who do not apply adequate fertilizer face yield reductions of 20–40%, which at any realistic crop price exceeds the cost of fertilizer even at supracompetitive prices. This means farmers will pay nearly any price for fertilizer before choosing to reduce crop production—a direct manifestation of inelastic demand.

219.    And as described above in Section IV.A.4., farmers must purchase nitrogen, phosphorus, and potassium each growing season and cannot avoid using any one of those nutrients in response to a significant, non-transitory price increase of that nutrient. Farmers must therefore

purchase each nutrient every growing season to maximize their crop yields.

220.    Substantial evidence further demonstrates the inelastic character of fertilizer demand. A USDA survey of 1,600-plus farmers found that 72% expressed concerns about fertilizer producer market power and 62% described unfair price-setting practices—confirming that farmers perceived themselves as captive buyers with no realistic alternative. Economists at the University of Illinois projected that fertilizer cost increases in 2021–2022 would reduce net farm income in Illinois alone by 34%—confirming that farmers absorbed the cost increase rather than reducing fertilizer purchases.

### 6. High Degree of Product Interchangeability

221.    When products are fungible or closely substitutable, price increases by one producer cause buyers to switch to competitors—the mechanism that ordinarily disciplines pricing in competitive markets. When products are standardized and interchangeable across all major producers, price increases by a coordinating group of producers are effective because buyers have no competitive alternative.

222.    Fertilizer products are highly standardized commodities. Urea is urea—whether produced by CF Industries, Nutrien, or Koch, it is chemically identical. Muriate of potash (MOP) is standardized by nutrient grade and is fungible whether produced by Nutrien's Allan mine or Mosaic's Esterhazy mine. DAP and MAP are standardized phosphate fertilizers, which follow strict industry standards, and are interchangeable regardless of producer. NPK blends with the same ratio (like 20-20-10) are substitutes for each other, no matter who produced the underlying nutrients. The absence of meaningful product differentiation means that farmers choose between producers primarily on price and availability—not on product quality or brand attributes. In a competitive market, this fungibility would ensure robust price competition as buyers switch to the

lowest-cost producer.

223.    The fungibility of fertilizer products also means that Defendants can observe and verify each other's pricing through published commodity price indices, creating a transparent verification mechanism for any coordinated pricing scheme. Green Markets, DTN/Progressive Farmer, and USDA's Agricultural Prices report publish weekly or monthly fertilizer price data for all major products and regions. Any Defendant that deviated from coordinated pricing by offering discounts would be observable in these indices within weeks. The combination of product fungibility and transparent price discovery makes coordination both easy to implement and easy to monitor—conditions that antitrust economists identify as highly conducive to tacit collusion.

### 7. Defendants' Prior Antitrust Violations and History of Cartel Conduct

224.    There is a well-documented history of antitrust violations and cartel behavior in the fertilizer industry, including by at least two Defendants and their corporate predecessors. This history reflects an entrenched culture of anticompetitive conduct and demonstrates that the conspiracy alleged here is not an anomaly, but rather a continuation of a long-standing pattern.

225.    In 2008—the last time global potash prices spiked to their highest recorded levels—multiple class action antitrust complaints were filed in the United States on behalf of potash buyers, alleging that a global cartel of potash producers including PotashCorp (Nutrien's predecessor), Mosaic, and Agrium (also a Nutrien predecessor) conspired to fix potash prices and restrict supply in violation of Section 1 of the Sherman Antitrust Act. In 2013, Mosaic, PotashCorp, and Agrium agreed to pay a combined $80 million to the direct-purchaser plaintiffs to resolve the litigation. These settlements—entered into by the direct corporate predecessors of Nutrien and by the same Mosaic entity named as a Defendant here—demonstrate a concrete prior episode in which these very companies coordinated anticompetitively the last time prices reached comparable heights.

## V.    ANTITRUST INJURY AND STANDING

226.    Defendants' anticompetitive conduct had the following effects, among others:

a.  Price competition has been restrained or eliminated with respect to Fertilizer Products;

b.  Fertilizer Product prices have been fixed, raised, stabilized, or maintained at artificially inflated levels;

c.  Plaintiff and the Class have been deprived of free and open competition; and

d.  Plaintiff and the Class paid artificially inflated Fertilizer Product prices.

227.    Plaintiff and the Class have standing under the antitrust laws they plead below as direct purchasers of Defendants' products. The harm suffered by Plaintiff and the Class is directly traceable to Defendants' unlawful conduct.

228.    The overcharges suffered by Plaintiff and the proposed Class are paradigmatic antitrust injury—i.e., injury of the type that federal antitrust laws were meant to redress.

## VI.    TOLLING OF THE STATUTE OF LIMITATIONS

229.    Plaintiff's claims are timely, and to the extent any claims might otherwise be subject to a statute of limitations defense, the running of any applicable limitations period was tolled by Defendants' fraudulent concealment of their conspiracy.

230.    The conspiracy alleged herein is, by its very nature, self-concealing. The conspiracy alleged here involved coordinated pricing and supply restriction decisions made privately among Defendants' senior executives, the details of which were not disclosed to Plaintiff or the public.

231.    Beyond the inherently self-concealing nature of the conspiracy, Defendants engaged in affirmative acts of concealment designed to disguise their coordinated pricing and supply restriction as the product of legitimate market forces. Throughout the Class Period,

Defendants publicly and repeatedly attributed their supracompetitive pricing to a series of exogenous events and cost pressures—including pandemic-related disruptions, extreme weather events, geopolitical sanctions, foreign export restrictions, and the conflict in Ukraine. By offering these pretextual explanations in earnings calls, investor presentations, press releases, and public statements, Defendants constructed a facially legitimate—but materially incomplete and misleading—narrative that concealed the true cause of the price increases: their coordinated agreement to fix prices and restrict supply.

232. Plaintiff exercised reasonable due diligence but could not have discovered Defendants' conspiracy prior to the public disclosure of government investigations and official statements beginning in late 2025. Plaintiff is a farmer and agricultural purchaser, not market analyst or antitrust investigator. They lack the financial expertise needed to detect defendants' conspiracy from publicly available data alone. Prior to the disclosure of government investigations, Plaintiff had no basis to distinguish Defendants' supracompetitive pricing from the cost-driven and supply-shock explanations that Defendants had publicly and repeatedly offered.

233. Moreover, the conspiracy alleged herein constitutes a continuing violation of Section 1 of the Sherman Act. Each sale of Fertilizer Products at supracompetitive prices during the Class Period constituted a separate overt act in furtherance of the conspiracy, and each such sale restarted any applicable limitations period. The conspiracy was ongoing as of the date this Complaint was filed, as evidenced by Defendants' continued supracompetitive pricing. Accordingly, Plaintiff's claims are timely under both the fraudulent concealment doctrine and the continuing violation doctrine.

## VII.  CLASS ACTION ALLEGATIONS

234. Plaintiff brings this action on behalf of themselves and under Federal Rules of Civil

Procedure 23(a) and 23(b)(2) and 23(b)(3), on behalf of themselves and all other persons and entities similarly situated (the "Class"), defined as:

> All persons and entities in the United States and its territories who purchased a Fertilizer Product[8] directly from one or more of the Defendants at any time during the period from January 1, 2021, through and until the anticompetitive effects of Defendants' challenged conduct cease (the "Class Period").

> Excluded from the Class are (1) the Court (including staff) presiding over this action and any members of their immediate families; (2) all jurors assigned to this case; (3) Defendants, Defendants' subsidiaries, affiliates, parents, successors, predecessors, and any entity in which Defendants or their parents have a controlling interest, and their current or former employees, officers, and directors; (4) Plaintiff's counsel and Defendants' counsel; and (5) state and federal government entities.

Plaintiff reserves the right to modify, change, or expand the Class definition based upon discovery and further investigation.

235.   **Numerosity:**  The Class is so numerous as to make joinder impracticable. Plaintiff does not know the exact number of Class members but believe that due to the nature of the Fertilizer Product industry that there are at least hundreds of thousands of individuals in the United States.

236.   **Commonality and Predominance:**  Common questions of law and fact exist with respect to each of the claims and predominate over questions affecting only individual Class members.  Questions common to the Class include, but are not limited to:

   a.   Whether Defendants combined and/or conspired to fix, raise, maintain, and/or stabilize prices of Fertilizer Products at any time during the Class Period;

   b.   Whether Defendants fixed, raised, maintained and/or stabilized prices of Fertilizer

---

[8] As defined in Footnote 1, supra.

Products sold to purchasers in the United States at any time during the Class Period, or committed other conduct in furtherance of the conspiracy alleged herein;

c. Whether Defendants engaged in conduct that violated Sections 1 and 3 of the Sherman Act;

d. Whether Defendants fraudulently concealed their conduct from purchasers of Fertilizer Products in the United States;

e. Whether Defendants' conduct caused the prices of Fertilizer Products sold directly to Plaintiff and other members of the Class to be higher than the prices that would have prevailed in a competitive market as a result of their restraint of trade;

f. Whether Plaintiff and other members of the Class were injured by Defendants' conduct and, if so, the determination of the appropriate Class wide measure of damages; and

g. Whether Plaintiff and other members of the Class are entitled to, among other things, injunctive relief, and, if so, the nature and extent of such relief.

237.    **Typicality**: Plaintiff's claims are typical of the claims of Class members in that Plaintiff, like all Class members, has been injured by Defendants' misconduct — contracting, combining, or conspiring to fix, maintain, or raise the prices of Fertilizer Products.

238.    **Adequacy of Representation:**  Plaintiff will fairly and adequately represent and protect the interests of the Class.  Plaintiff has retained counsel with substantial experience in prosecuting complex litigation and class actions, including antitrust class actions.  Plaintiff does not have any interests antagonistic to those of the Class.

239.    **Superiority:** A class action is superior to other available methods for the fair and efficient adjudication of this controversy.  Class-wide damages are essential to induce Defendants

83

to comply with federal and state law.  Moreover, because the amount of each individual Class member's claim is small relative to the complexity of the litigation, and because of Defendants' financial resources, Class members are unlikely to pursue legal redress individually for the violations detailed in this complaint.  A class action will allow these claims to be heard where they would otherwise go unheard because of the expense of bringing individual lawsuits, and provides the benefits of adjudication, economies of scale, and comprehensive supervision by a single court.

240.    **Injunctive relief:** Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive relief and corresponding declaratory relief with respect to the class as a whole.

## VIII.   CAUSE OF ACTION

### Violation of the Sherman Act, 15 U.S.C. §§ 1, 3
### (Against All Defendants)

241.    Plaintiff realleges and incorporates by reference each and every allegation set forth in the preceding paragraphs as if fully set forth herein.

242.    During the Class Period, Defendants entered into, continued, and gave effect to a combination and conspiracy in unreasonable restraint of trade and commerce, in violation of Sections 1 and 3 of the Sherman Act (15 U.S.C. §§ 1, 3).

243.    The contract, combination, or conspiracy consisted of an agreement among Defendants and their co-conspirators to: (a) fix, raise, stabilize, and maintain the prices of Fertilizer Products sold in the United States at supracompetitive levels; and (b) restrict, limit, and suppress the supply of Fertilizer Products available to United States purchasers.

244.    Defendants' anticompetitive and unlawful conduct has proximately caused injury to Plaintiff and members of the Class by restraining competition and thereby raising, maintaining, and/or stabilizing the price of Fertilizer Products at levels above the prices that would have

prevailed in a competitive market.

245. Defendants' activities constitute a *per se* violation of Sections 1 and 3 of the Sherman Act.

246. Plaintiff and members of the Class are entitled to treble damages, injunctive relief, and attorneys' fees and costs pursuant to Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 & 26.

## IX. PRAYER FOR RELIEF

WHEREFORE, Plaintiff, individually and on behalf of the proposed Class, respectfully request that this Court:

(a) Certify this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure, designate Plaintiff as Class Representatives, and appoint Plaintiff's counsel as Class Counsel;

(b) Find and adjudge that Defendants' conduct violated Sections 1 and 3 of the Sherman Antitrust Act;

(c) Award all damages to which Plaintiff and Class members are entitled, including treble damages under the Clayton Act;

(d) Award Plaintiff and the Class pre-judgment and post-judgment interest at the legal rate;

(e) Enter injunctive and/or declaratory relief as is necessary to protect the interests of Plaintiff and Class members, including enjoining and restraining Defendants, their affiliates, successors, transferees, assignees, and other officers, directors, agents, and employees thereof, and all other persons acting or claiming to act on their behalf, from in any manner continuing, maintaining, or renewing the conduct, contract, conspiracy, or combination alleged herein, or from

entering into any other contract, conspiracy, or combination having a similar purpose or effect, and from adopting or following any practice, plan, program, or device having a similar purpose or effect;

(f)     Award Plaintiff and Class members reasonable litigation expenses and attorneys' fees as permitted by law; and

(g)     Award such other and further relief as the Court deems necessary and appropriate.

## X.     DEMAND FOR JURY TRIAL

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff hereby demands trial by jury on all issues so triable.

Dated: April 27, 2026.                    Respectfully submitted,

By s/ Christopher M. Burke
Christopher M. Burke (#1022722)
John Chisholm (#1023023)
**BURKE LLP**
402 West Broadway, Suite 1890
San Diego, CA 92101
Phone: (619) 369-8244
cburke@burke.law
john.chisholm@burke.law

Patrick McGahan (pro hac vice forthcoming)
**SCOTT+SCOTT ATTORNEYS AT LAW LLP**
156 S Main Street
P.O. Box 192
Colchester, CT 06415
Tel: (860) 537-5537
Fax : (860) 537-4432
pmcgahan@scott-scott.com

Vincent Briganti (pro hac vice forthcoming)
**LOWEY DANNENBERG, P.C**.
44 South Broadway, Suite 1100
White Plains, NY 10601

86

Phone: (914) 997-0500
Fax: (914) 997-0035
vbriganti@lowey.com

Case: 3:26-cv-00392    Document #: 1    Filed: 04/27/26    Page 89 of 89

87